JOHN A. CASE, JR. (126671)
        jcase@CaseWebLaw.com
LAW OFFICES OF JOHN A. CASE, JR.
11601 Wilshire Blvd. Suite 500
Los Angeles, California 90025
(310) 203-3911, fax (310) 867-2096

Attorneys for Plaintiffs
IMEX LEADER, INC, a California corporation
and IRINA GRANT

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

IMEX LEADER, INC., a California
corporation; and IRINA GRANT,

          Plaintiffs,

          vs.

ZEST US WHOLESALE INC.,
a California corporation; ZEST US,
a California corporation; ADIL AL
HOURANI, an individual; OMAR AL
HOURANI, an individual; KGR
DISTRIBUTION CORP., a New
Jersey corporation; RAVI KOMMI, an
individual; SHIMS BARGAIN, INC., a
California corporation, doing
business as JC SALES; and DOES
1-100, inclusive,

          Defendants.

Case No. 8:22-cv-01432

COMPLAINT FOR:

(1)  TRADEMARK
     INFRINGEMENT UNDER
     15 U.S.C. § 1114

(2)  UNFAIR COMPETITION AND
     FALSE DESIGNATION OF
     ORIGIN UNDER 15 U.S.C.
     § 1125(a)

(3)  COMMON LAW TRADEMARK
     INFRINGEMENT

(4)  COPYRIGHT
     INFRINGEMENT UNDER
     17 U.S.C. § 101 *et seq.*

(5)  UNFAIR COMPETITION
     UNDER CALIFORNIA
     BUSINESS & PROFESSIONS
     CODE § 17200 *et seq.*

(6)  COMMON LAW UNFAIR
     COMPETITION

DEMAND FOR JURY TRIAL

1

**COMPLAINT**

For their Complaint herein, plaintiffs IMEX LEADER, INC., a California corporation ("Imex"), and IRINA GRANT ("Grant") allege, based upon their own personal knowledge or upon information and belief as to matters not within their own personal knowledge, as follows:

### *NATURE OF THE ACTION*

1.      This is a civil action for trademark infringement under the Lanham Act, 15 U.S.C. § 1114; unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a); common law trademark infringement; copyright infringement under 17 U.S.C. § 101 *et seq.*; unfair competition under California Business & Professions Code § 17200 *et seq.*; and common law unfair competition.

2.      Plaintiffs seek relief against defendants ZEST US WHOLESALE, INC. and its predecessor company ZEST US (collectively, "Zest US"); Zest US's owners ADIL AL HOURANI and OMAR AL HOURANI; Zest US's exclusive supplier KGR DISTRIBUTION CORP. ("KGR"); KGR's owner RAVI KOMMI; Zest US's local distributor SHIMS BARGAIN, INC., doing business as JC SALES; and all persons acting in concert or conspiracy with them.  Defendant Zest US is Imex's former distributor.  Defendants are marketing, advertising, distributing, selling, and offering for sale in the Central District of California and the United States products called "Cosby Fun," "Toybox Drajebon," "The Smileys," ""Mr Egg," "Mrs Egg," and "Junior Surprise Eggs," all of which infringe Imex's registered trademarks and copyrights. Defendants' products consist of candy and toys packaged in egg-shaped containers which are confusingly similar to Imex's product lines of candy and toys packaged in egg-shaped containers.  The trade dress of defendants' products is similar in total image, overall appearance, and look and feel to

2

Imex's trade dress.  Consumers viewing defendants' products are likely to be confused into believing that Imex is the source of defendants' products. Defendants began selling confusingly similar products on purpose after originally gaining access to and knowledge of Imex's products.  Defendants are deliberately infringing plaintiffs' registered trademarks and copyrights in knowing and intentional derogation of plaintiffs' rights, trading on plaintiffs' goodwill, competing unfairly with Imex, and causing harm to plaintiffs. Plaintiffs are entitled to full and complete relief as prayed for herein.

### *JURISDICTION AND VENUE*

3.    This subject matter jurisdiction of this Court is based upon 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338, and 1367.

4.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1400 because one or more defendants reside and may be found in the Central District of California; and because a substantial part of the events or omissions giving rise to the claims pleaded herein occurred in the Central District of California.

### *PARTIES*

5.    Plaintiff Imex Leader, Inc., a California corporation ("Imex"), is a corporation incorporated in the State of California with its principal place of business in Orange County, California.

6.    Plaintiff Irina Grant ("Grant") is an individual residing in the State of California.

7.    On information and belief, defendant Zest US Wholesale, Inc., a California corporation, is a corporation incorporated under the laws of the State of California with its principal place of business in Fullerton, California.

3

8. On information and belief, defendant Zest US, a California corporation, is a corporation incorporated under the laws of the State of California with its principal place of business in Fullerton, California. On information and belief, defendant Zest US is the predecessor of defendant Zest US Wholesale Inc. Defendants Zest US Wholesale, Inc. and Zest US are referred to collectively herein as "Zest US."

9. On information and belief, defendant Adil Al Hourani is an individual residing in Orange County, California. On information and belief, defendant Adil Al Hourani is an owner of Zest US, controls its actions, and directly participates in its actions.

10. On information and belief, defendant Omar Al Hourani is an individual residing in Orange County, California. On information and belief, defendant Omar Al Hourani is Adil Al Hourani's cousin and an owner of Zest US, controls its actions, and directly participates in its actions.

11. On information and belief, defendant KGR Distribution Corp., a New Jersey corporation ("KGR"), is a corporation incorporated under the laws of the State of New Jersey, with its principal place of business in Passaic, New Jersey. On information and belief, defendant KGR is the exclusive United States distributor for "Cosby Fun" and "Toybox Drajebon." On information and belief, KGR ships such products to a warehouse in Fullerton, California, which it shares with Zest US, for resale in California. On information and belief, defendant Zest US is KGR's exclusive distributor of such products in California, exclusively purchases such products from KGR for resale in California, and sells such products in California.

12. On information and belief, defendant Ravi Kommi is an individual residing in the State of New Jersey. On information and belief, defendant Ravi Kommi is an owner of defendant KGR, controls its actions, and directly participates in its actions. On information and belief, defendant

4

Ravi Kommi is the guiding spirit behind KGR's wrongful conduct alleged herein.  On information and belief, defendant Ravi Kommi is the central figure in the challenged corporate activity alleged against KGR herein.

13.    On information and belief, defendant Shims Bargain, Inc., a California corporation, is a corporation incorporated under the laws of the State of California, with its principal place of business in Los Angeles, California.  On information and belief, defendant Shims Bargain, Inc. does business in Los Angeles, California under the name JC Sales.  On information and belief, defendant Shims Bargain, Inc. exclusively purchases "Cosby Fun," "Toybox Drajebon," and "The Smileys" from defendant Zest US in California.

14.    Plaintiffs are unaware of the true names and capacities of the defendants sued as Does 1 through 100, inclusive, and therefore sue those defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities when that information is ascertained.  Plaintiffs are informed and believe, and therefore allege, that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that plaintiffs' injuries as herein alleged were proximately caused by such defendants.

15.    On information and belief, defendants' actions alleged herein were undertaken by each defendant individually; were actions that each defendant caused to occur; were actions that each defendant authorized, controlled, directed, or had the ability to authorize, control, or direct; or were actions in which each defendant assisted, participated, or otherwise encouraged; and are actions for which each defendant is liable.  On information and belief, each of the defendants acted as the agent, employee, partner, co-conspirator, alter ego, predecessor, or successor of each of the other defendants.  On information and belief, in performing the acts and omissions alleged herein, each of the defendants acted within the course and

1   scope of such agency, employment, partnership, conspiracy, alter ego, or

2   predecessor-successor relationship.  On information and belief, in performing

3   the acts and omissions alleged in this Complaint, each of the defendants

4   herein acted in concert and conspiracy with each of the other defendants

5   herein; and aided and abetted the other defendants, in that each defendant

6   had knowledge of those actions, provided assistance, and benefited from

7   those actions, in whole or in part; except as otherwise specifically alleged

8   herein.

9

10   ### ***GENERAL ALLEGATIONS***

11   Plaintiffs' Rights and Registrations

12   16.   Plaintiff Imex has been in the business of food products

13   importation and distribution since 2010.  In or about 2016, Imex began to

14   develop and sell in Southern California and the United States a product line of

15   candy and toys packaged in egg-shaped containers.  Such products are sold

16   under U.S. registered trademarks such as Happy Egg®, King Egg®, MagiK

17   Egg®, Lucky Egg®, Emoji Egg®, Skazka Egg®, Delicious Enjoyable®, and

18   Eggs Time® (the "Imex Products").

19   17.   The Imex Products have a distinctive and instantly

20   recognizable trade dress, consisting of different suites of original characters

21   and stories depicted on egg-shaped containers, and all other artwork,

22   designs, and information on the containers (the "Imex Trade Dress").  The

23   Imex Products come in two sizes:  "small" and "giant."  The suites of

24   characters are designed to be collectibles.  Happy Egg® and King Egg® are

25   suites of cartoon characters identified by big faces, pronounced expressions,

26   and bright colors associated with each character.  Lucky Egg® is a suite of

27   cute animal characters.  MagiK Egg® is a suite of cute monster characters.

28   Emoji Egg® is a suite of cute characters based on emojis.  There are two

COMPLAINT

different versions of the Emoji Egg® suite.  Imex also manufactures, distributes, markets, and sells a product line under the Skazka Egg® trademark featuring a suite of original story art based on classic fairy tales. The Delicious Enjoyable® mark is featured on the King Egg® and MagiK Egg® product lines.  All product lines are marketed as part of the Eggs Time® brand.  Imex develops six to 16 characters or stories in each suite, so that complete suites may be sold as a unit to collectors inside Imex's custom display boxes.  The Imex Trade Dress is displayed on the Imex Products and also on packaging, point of sale materials, and advertising, promotional, and marketing materials for the Imex Products.

18.    Imex's marketing strategy for the Imex Products focuses on the education and health of young children.  The characters are part of an educational program developed by Imex for young children and explained on the eggstime.com website.  Each character has a backstory developed by Imex and described on the eggstime.com website.  The eggstime.com website provides stories and games for kids based on the characters on the Imex Products.  The Happy Egg® and Lucky Egg® products have vitamins as part of the nutritional content.

19.    Imex sells the Imex Products to distributors, to retail stores, and directly to the general public.  The Imex Products are sold to the general public on Walmart.com and Amazon.com and nationwide through distributors in more than 10,000 grocery stores, convenience stores, department stores, gas stations, and other retail stores throughout the U.S.  The Imex Products are popular with children and their parents and are often purchased by impulse buyers.  Retailers typically display them near checkout, in the candy and confectionery aisles, and in aisles featuring novelty items.

20.    Imex has advertised the Imex Products through video commercials on television, YouTube, Instagram, Facebook, and other

7

platforms.  Imex regularly uses social media platforms such as Instagram, Facebook, and YouTube to market and advertise the Imex Products.  Imex regularly posts videos and photos of Imex Products on those platforms.  Social media influencers and fans of Imex Products expand Imex's marketing presence through their own videos and posts of Imex Products on social media.  Influencers post videos of Imex Products on TikTok, which is a social media platform that Imex does not use directly.  On information and belief, the social media videos, photos, and posts by Imex, influencers, fans, and others featuring Imex Products and Imex Trade Dress, taken together, have more than five million views.  Imex advertises and sells the Imex Products online through Imex's own website, eggstime.com.  Imex's advertisements and display materials prominently feature the Imex Trade Dress.

21.    Imex's online video commercial "Lucky Egg Surprise" is a 2020 w3 Awards Silver Winner.  On information and belief, the w3 Awards are annual awards given by the Academy of Interactive and Visual Arts (AIVA), honoring outstanding efforts in online marketing each year.  On information and belief, AIVA is an invitation-only assembly of industry professionals, which includes executives from organizations such as Accenture Interactive, Big Spaceship, Conde Nast, GE Digital, Majestyk, Microsoft, MTV Networks, Spotify, Tool of North America, and Wired.  Imex's award-winning video "Lucky Egg Surprise" advertises Imex's Lucky Egg® suite of products and prominently features the Imex Trade Dress.

22.    Imex exhibits the Imex Products at major trade shows attended by industry representatives from all over the world.  Imex does so at major trade shows such as the Sweets and Snacks Show sponsored by the National Confectioners Association and held in Chicago; the Toy Fair sponsored by the Toy Association and held in New York; and the NACS Show sponsored by the National Association of Convenience Stores (also known as

8

the Association for Convenience and Petroleum Retailing), rotating between Chicago, Las Vegas, and Atlanta.  Imex's exhibition booths and display materials at such trade shows prominently feature the Imex Trade Dress.

23.    Imex is a member of WBENC (Women's Business Enterprise National Council).

24.    The kidSAFE Seal Program is an independent safety certification service and seal-of-approval program designed exclusively for children-friendly websites and technologies, including online game sites, educational services, virtual worlds, social networks, mobile apps, tablet devices, connected toys, and other similar online and interactive services. Imex qualified for and obtained the kidSAFE "certified" seal for its products and services.

25.    Imex has registered plaintiffs' trademarks and copyrights with U.S. Customs and Border Protection to prevent importation of counterfeit goods from abroad.

26.    Imex has advertised, marketed, and sold thousands of Imex Products since entering the business in or about 2016.  Imex has extensively advertised, marketed, and sold the Imex Products throughout the Central District of California and the United States.  Imex has achieved a substantial degree of customer recognition, brand loyalty, goodwill, and reputation for quality in the Imex Products and the Imex Trade Dress throughout the Central District of California and the United States.

27.    Plaintiff Grant is the owner of various U.S. registered trademarks for the Imex Products.  Plaintiff Grant exclusively licenses such trademarks to Imex, which is the exclusive distributor of the Imex Products in the United States and throughout the world.  Plaintiff Grant has obtained U.S. registrations for both word marks and design marks for the Imex Products.
//

COMPLAINT

28.    The following are U.S. registered word marks owned by Grant for the Imex Products (the "Registered Word Marks"):

(a)    KING EGG®, U.S. registration number 5,384,131, registered January 23, 2018, first used in commerce on January 4, 2017.

(b)    HAPPY EGG®, U.S. registration number 5,500,620, registered June 26, 2018, first used in commerce on February 14, 2017.

(c)    LUCKY EGG®, U.S. registration number 5,384,147, registered January 23, 2018, first used in commerce on March 30, 2017.

(d)    MAGIK EGG®, U.S. registration number 5,384,148, registered January 23, 2018, first used in commerce on April 1, 2017.

(e)    EMOJI EGG®, U.S. registration number 5,688,087, registered February 26, 2019, first used in commerce on June 1, 2017.

(f)    SKAZKA EGG®, U.S. registration number 5,832,847, registered August 13, 2019, first used in commerce on January 7, 2019.

(g)    DELICIOUS ENJOYABLE®, U.S. registration number 5,870,780, registered October 1, 2019, first used in commerce on April 7, 2017.

(h)    EGGS TIME®, U.S. registration number 5,463,652, registered May 8, 2018, first used in commerce on August 7, 2017.

(i)    KING TOY®, U.S. registration number 5,378,679, registered January 16, 2018, first used in commerce on April 27, 2017.

(j)    HAPPY TOY®, U.S. registration number 5,373,877, registered January 9, 2018, first used in commerce on February 14, 2017.

(k)    LUCKY TOY®, U.S. registration number 5,368,608, registered January 2, 2018, first used in commerce on April 10, 2017.

(l)    MAGIK TOY®, U.S. registration number 5,373,638, registered January 9, 2018, first used in commerce on February 4, 2017.

//

10

COMPLAINT

29.     The following are U.S. registered design marks owned by Grant for the Imex Trade Dress and Imex Products (the "Registered Design Marks"), for which specimens are attached hereto as Exhibit A:

(a)     MagiK Egg® "Autumn", U.S. registration number 5,674,266, registered February 12, 2019, first used in commerce on April 1, 2017.

(b)     MagiK Egg® "Flower", U.S. registration number 5,674,582, registered February 12, 2019, first used in commerce on April 1, 2017.

(c)     MagiK Egg® "Moon", U.S. registration number 5,674,581, registered February 12, 2019, first used in commerce on April 1, 2017.

(d)     MagiK Egg® "Ocean", U.S. registration number 5,674,583, registered February 12, 2019, first used in commerce on April 1, 2017.

(e)     MagiK Egg® "Rainbow", U.S. registration number 5,674,261, registered February 12, 2019, first used in commerce on April 1, 2017.

(f)     MagiK Egg® "River", U.S. registration number 5,673,973, registered February 12, 2019, first used in commerce on April 1, 2017.

(g)     MagiK Egg® "Sky", U.S. registration number 5,684,358, registered February 26, 2019, first used in commerce on April 1, 2017.

(h)     MagiK Egg® "Spring", U.S. registration number 5,674,468, registered February 12, 2019, first used in commerce on April 1, 2017.

//

COMPLAINT

1          (i)    MagiK Egg® "Star", U.S. registration number
2 5,674,467, registered February 12, 2019, first used in commerce on April 1,
3 2017.
4          (j)    MagiK Egg® "Summer", U.S. registration number
5 5,674,259, registered February 12, 2019, first used in commerce on April 1,
6 2017.
7          (k)    MagiK Egg® "Sunshine", U.S. registration number
8 5,674,352, registered February 12, 2019, first used in commerce on April 1,
9 2017.
10          (l)    MagiK Egg® "Winter", U.S. registration number
11 5,674,465, registered February 12, 2019, first used in commerce on April 1,
12 2017.
13          (m)    Eggs Time®, U.S. registration number 5,589,234,
14 registered October 23, 2018, first used in commerce on November 1, 2017.
15          (n)    Happy Egg® Captain, U.S. registration number
16 6,557,209, registered November 9, 2021, first used in commerce on June 28,
17 2018.
18          (o)    Happy Egg® Geek, U.S. registration number
19 6,604,258, registered December 28, 2021, first used in commerce on June
20 28, 2018.
21          (p)    Happy Egg® Hani, U.S. registration number
22 6,604,259, registered December 28, 2021, first used in commerce on June
23 28, 2018.
24          (q)    Happy Egg® Joy, U.S. registration number 6,557,210,
25 registered November 9, 2021, first used in commerce on June 28, 2018.
26          (r)    Happy Egg® Merry, U.S. registration number
27 6,604,261, registered December 28, 2021, first used in commerce on June
28 28, 2018.

12

COMPLAINT

1      (s)     Happy Egg® Victory, U.S. registration number
2  6,604,260, registered December 28, 2021, first used in commerce on June
3  28, 2018.

4      (t)     Skazka Egg® Frog Princess, U.S. registration number
5  6,557,177, registered November 9, 2021, first used in commerce on January
6  7, 2019.

7      (u)     Skazka Egg® Gingerbread Man, U.S. registration
8  number 6,557,164, registered November 9, 2021, first used in commerce on
9  January 7, 2019.

10      (v)     Skazka Egg® Golden Fish, U.S. registration number
11  6,557,163, registered November 9, 2021, first used in commerce on January
12  7, 2019.

13      (w)     Skazka Egg® Little Red Riding Hood, U.S. registration
14  number 6,557,165, registered November 9, 2021, first used in commerce on
15  January 7, 2019.

16      (x)     Skazka Egg® Pinokio, U.S. registration number
17  6,557,166, registered November 9, 2021, first used in commerce on January
18  7, 2019.

19      (y)     Skazka Egg® Puss In Boots, U.S. registration number
20  6,557,174, registered November 9, 2021, first used in commerce on January
21  7, 2019.

22      (z)     Skazka Egg® Riaba The Hen, U.S. registration
23  number 6,557,173, registered November 9, 2021, first used in commerce on
24  January 7, 2019.

25      (aa)    Skazka Egg® Thumbelina, U.S. registration number
26  6,557,176, registered November 9, 2021, first used in commerce on January
27  7, 2019.

28  //

13

1    30.    Plaintiff Grant owns the copyrights for all original artwork and

2    designs constituting the Imex Trade Dress and used for the Imex Trade Dress

3    and Imex Products.  Grant exclusively licenses such copyrights to Imex, which

4    is the exclusive distributor of the Imex Products in the United States and

5    throughout the world.

6    31.    Plaintiff Grant owns the copyrights to the MagiK Egg®

7    registered design marks set forth in Paragraph 29 above and registered such

8    copyrights with the U.S. Copyright Office under the titles "MagiK Egg 12

9    Designs", U.S. registration number VA-2-107-942, registered June 18, 2018;

10   "MagiK Egg 'Autumn' and 9 Other Unpublished Works", registration number

11   VAu-1-405-148, registered June 14, 2020; and as part of "King Egg 'Snoopy'

12   and 3 Other Unpublished Works," U.S. registration number VAu-1-405-147,

13   registered June 14, 2020.

14   32.    Plaintiff Grant owns the copyrights to the Skazka Egg®

15   registered design marks set forth in Paragraph 29 above and registered such

16   copyrights with the U.S. Copyright Office under the title "Skazka Egg 'Pinokio'

17   and 8 Other Unpublished Works", U.S. registration number VAu-1-406-848,

18   registered June 14, 2020.

19   33.    Plaintiff Grant owns the copyrights to the Happy Egg®

20   registered design marks set forth in Paragraph 29 above and registered such

21   copyrights with the U.S. Copyright Office under the following titles:

22   (a)    Happy Egg "Captain", U.S. registration number VA-2-

23   141-393, registered June 27, 2018.

24   (b)    Happy Egg "Geek", U.S. registration number VA-2-

25   141-398, registered June 20, 2018.

26   (c)    Happy Egg "Hani", U.S. registration number VA-2-141-

27   400, registered June 20, 2018.

28   //

COMPLAINT

1        (d) Happy Egg "Joy", U.S. registration number VA-2-141-

2 402, registered June 20, 2018.

3        (e) Happy Egg "Merry", U.S. registration number VA-2-

4 141-401, registered June 20, 2018.

5        (f) Happy Egg "Victory", U.S. registration number VA-2-

6 141-399, registered June 20, 2018.

7     34. Plaintiff Grant owns the copyrights to all artwork and designs

8 used for the Imex Trade Dress and Imex Products.  In addition to the

9 registrations set forth in the preceding paragraphs, the following are other

10 U.S. copyright registrations for Imex Trade Dress owned by Grant, for which

11 copies of the registered works are attached hereto as Exhibit B:

12        (a) Emoji Egg "Cupcake", U.S. registration number VA-2-

13 111-507, registered July 11, 2018.

14        (b) Emoji Egg "Magic", U.S. registration number VA-2-

15 111-534, registered July 11, 2018.

16        (c) Emoji Egg "Melody", U.S. registration number VA-2-

17 111-528, registered July 11, 2018.

18        (d) Emoji Egg "Neo", U.S. registration number VA-2-111-

19 536, registered July 11, 2018.

20        (e) Emoji Egg "Smiley", U.S. registration number VA-2-

21 111-518, registered July 11, 2018.

22        (f) Emoji Egg "Sunshine", U.S. registration number VA-2-

23 111-531, registered July 11, 2018.

24        (g) Emoji Egg "Twinkie", U.S. registration number VA-2-

25 111-512, registered July 11, 2018.

26        (h) King Egg "Beauty", under the title "King Egg 'Beauty'

27 and 9 Other Unpublished Works", U.S. registration number VAu-1-405-142,

28 registered June 14, 2020.

COMPLAINT

1           (i)     King Egg "Candy", under the title "King Egg 'Beauty'
2 and 9 Other Unpublished Works", U.S. registration number VAu-1-405-142,
3 registered June 14, 2020.

4           (j)     King Egg "Cricky", under the title "King Egg 'Beauty'
5 and 9 Other Unpublished Works", U.S. registration number VAu-1-405-142,
6 registered June 14, 2020.

7           (k)     King Egg "Cutie", under the title "King Egg 'Beauty'
8 and 9 Other Unpublished Works", U.S. registration number VAu-1-405-142,
9 registered June 14, 2020.

10           (l)     King Egg "Dreamy", under the title "King Egg 'Beauty'
11 and 9 Other Unpublished Works", U.S. registration number VAu-1-405-142,
12 registered June 14, 2020.  Grant's application for U.S. trademark
13 registration is currently pending for this design.

14           (m)     King Egg "Funny", under the title "King Egg 'Beauty'
15 and 9 Other Unpublished Works", U.S. registration number VAu-1-405-142,
16 registered June 14, 2020.

17           (n)     King Egg "Goofy", under the title "King Egg 'Beauty'
18 and 9 Other Unpublished Works", U.S. registration number VAu-1-405-142,
19 registered June 14, 2020.

20           (o)     King Egg "Grumpy", under the title "King Egg 'Beauty'
21 and 9 Other Unpublished Works", U.S. registration number VAu-1-405-142,
22 registered June 14, 2020.

23           (p)     King Egg "Pooky", under the title "King Egg 'Beauty'
24 and 9 Other Unpublished Works", U.S. registration number VAu-1-405-142,
25 registered June 14, 2020.

26           (q)     King Egg "Pretty", under the title "King Egg 'Beauty'
27 and 9 Other Unpublished Works", U.S. registration number VAu-1-405-142,
28 registered June 14, 2020.

COMPLAINT

1               (r)    King Egg "Snoopy", under the title "King Egg 'Snoopy'

2  and 3 Other Unpublished Works", U.S. registration number VAu-1-405-147,

3  registered June 14, 2020.

4               (s)    King Egg "Sweetie", "King Egg 'Snoopy' and 3 Other

5  Unpublished Works", U.S. registration number VAu-1-405-147, U.S.

6  registration number VAu-1-405-147, registered June 14, 2020.

7               (t)    Skazka Egg "At the Pike's Behest", under the title

8  "Skazka Egg 'Pinokio' and 8 Other Unpublished Works", U.S. registration

9  number VAu-1-406-848, registered June 14, 2020.

10               (u)    Happy Toy "Merry", U.S. registration number VA-2-

11  112-822, registered July 30, 2018.

12               (v)    King Toy "Pretty", U.S. registration number VA-2-112-

13  845, registered July 27, 2018.

14               (w)    MagiK Toy 12 Designs, U.S. registration number VA-2-

15  111-330, registered January 14, 2018.

16       35.    All of Grant's registered copyrighted works set forth in

17  Paragraphs 31 through 34, inclusive, are referred to collectively herein as the

18  "Registered Copyrighted Works."

19       36.    Plaintiff Grant also owns unregistered trade dress and

20  trademarks for the Imex Products, including without limitation two versions of

21  Emoji Egg® "Ace", Emoji Egg® "Chief", two versions of Emoji Egg® "Fox",

22  two versions of Emoji Egg® "Hop", two versions of Emoji Egg® "Mac", a new

23  version of Emoji Egg® "Magic", a new version of Emoji Egg® "Melody", a new

24  version of Emoji Egg® "Neo", a new version of Emoji Egg® "Sunshine", the

25  Lucky Egg® suite of characters, designs for various toys included within the

26  Imex Products, and the back side of all plaintiffs' egg-shaped containers.

27  Such unregistered trade dress and trademarks also include Grant's artwork

28  for which copyrights were registered but trademarks were not, as described in

COMPLAINT

Paragraph 34 above and shown in Exhibit B.  Grant currently intends to apply for U.S. trademark registration for designs that are currently unregistered. Grant exclusively licenses such unregistered trade dress and trademarks to Imex, which is the exclusive distributor of the Imex Products in the United States and throughout the world.  Attached hereto as Exhibit C are examples of plaintiffs' unregistered trade dress and trademarks that are not otherwise included in Exhibit B.  All of Grant's unregistered trade dress and trademarks is referred to collectively herein as the "Unregistered Trade Dress and Trademarks."

37.    The Imex Trade Dress consists of the Registered Word Marks, the Registered Design Marks, the Registered Copyrighted Works, and the Unregistered Trade Dress and Trademarks, as described above.

38.    Plaintiffs have continuously used and acquired common law trademark and trade dress rights in all the foregoing marks, designs, and artwork constituting the Imex Trade Dress.  The Imex Trade Dress identifies Imex to consumers and the general public as the source of Imex Products. Imex publicly displays the Imex Trade Dress on the Imex Products themselves, on advertising, promotional, and marketing materials for the Imex Products, and on packaging and point of sale materials such as Imex's custom display boxes and racks provided for use at retail outlets.  Attached hereto as Exhibit D are examples of Imex's custom display boxes and racks. Imex provides custom display boxes and racks to its distributors with bulk purchases of Imex Products.  Plaintiffs have built up valuable goodwill in the Imex Trade Dress, the Registered Word Marks, the Registered Design Marks, the Registered Copyrighted Works, and the Unregistered Trade Dress and Trademarks.  Such marks and trade dress have come to be associated exclusively with Imex.

//

18

COMPLAINT

Defendants' Background

39.     On information and belief, defendant Zest US is located in Fullerton, California, within the Central District of California.  Zest US is Imex's former distributor.  As distributor, Zest US purchased Imex Products for distribution and resale to retail stores and subdistributors.  Zest US's purchases directly from Imex totaled more than $182,000.  On information and belief, Zest US also purchased a substantial quantity of Imex Products directly from one of Imex's principal distributors.  On information and belief, Zest US bought King Egg®, Happy Egg®, MagiK Egg®, Emoji Egg®, and Skazka Egg® character suites.  Zest US also obtained Imex's custom display boxes and racks, decorated with the Registered Word Marks, the Registered Design Marks, the Registered Copyrighted Works, and the Unregistered Trade Dress and Trademarks, to be used to hold, advertise, and display Imex Products to customers at retail locations.  In or about 2018, defendants Adil Al Hourani and Omar Al Hourani, who are owners of Zest US, personally visited Imex's warehouse, where plaintiff Grant showed them the Imex Products and Imex Trade Dress.

40.     On information and belief, defendants Zest US, Adil Al Hourani, Omar Al Hourani, and other defendants deliberately began creating, designing, manufacturing, importing, shipping, selling, marketing, advertising, promoting, and distributing candy and toy products confusingly similar to the Imex Products.  Such defendants gained access to and knowledge of the Imex Products and the Imex Trade Dress when they purchased Imex Products.  Such defendants stopped buying Imex Products and, on information and belief, began selling confusingly similar products such as "Cosby Fun,""Toybox Drajebon," "The Smileys," "Mr Egg," "Mrs Egg," and "Junior Surprise Eggs" in the Central District of California.  On information and belief, Zest US sells, markets, advertises, promotes, and distributes such

19

COMPLAINT

products in the Central District of California.  On information and belief, Zest US's products are packaged in custom display boxes and racks that are confusingly similar to Imex's custom display boxes and racks.  On information and belief, such defendants used Imex's own custom display racks to display their own similar products in retail outlets for sale to consumers.  On information and belief, such defendants chose to market and sell such similar products in order to target Imex's customers in California and elsewhere, and to compete unfairly with Imex.

41.    A gray market good is a foreign-manufactured good, bearing a valid United States trademark, that is imported without the consent of the United States trademark holder.  On information and belief, Zest US imports and distributes substandard products from China and elsewhere bearing widely-known trademarks such as Peppa Pig, PAW Patrol, SpongeBob SquarePants, Frozen, The Avengers, Barbie, L.O.L. Surprise, and Tom & Jerry, without license to do so from the trademark owners.  On information and belief, Zest US sells, markets, advertises, promotes, and distributes such products in the Central District of California.

42.    On information and belief, Zest US's actions described herein were authorized, controlled, and directed by defendants Adil Al Hourani, Omar Al Hourani, and other defendants yet to be identified, at all relevant times.

43.    On information and belief, defendant KGR is located in the State of New Jersey.  On information and belief, KGR is the exclusive distributor in the United States for "Cosby Fun" and "Toybox Drajebon."  On information and belief, KGR ships its products, specifically "Cosby Fun" and "Toybox Drajebon," to a warehouse in Fullerton, California, which it shares with Zest US, for the specific purpose of resale in California to California and West Coast distributors and retailers.  On information and belief, Zest US is

COMPLAINT

KGR's exclusive distributor for "Cosby Fun" and "Toybox Drajebon" in California and the West Coast.  Both KGR and Zest US market, advertise, promote, and distribute such products in the Central District of California.  On information and belief, defendants KGR and Ravi Kommi tell California customers that they can buy KGR's products, specifically "Cosby Fun" and "Toybox Drajebon," in California from KGR's exclusive distributor Zest US. On information and belief, through its relationship with Zest US, KGR purposefully sells "Cosby Fun" and "Toybox Drajebon" in California to California customers, and acts with the intent to sell such products in California to California customers.  Defendants KGR and Kommi directly target California and are subject to personal jurisdiction in California.

44.   On information and belief, KGR imports products from Turkey and elsewhere bearing widely-known trademarks such as Dora The Explorer, PAW Patrol, SpongeBob SquarePants, Barbie, Baby Shark, and The Avengers, and imports foreign-made gray market goods of companies such as Ferrero and Mondelez, and sells and distributes those products in the Central District of California, without the trademark owners' authorization to import and sell such foreign-made products in the United States.  On information and belief, KGR ships such products to the Fullerton warehouse that it shares with Zest US, for the specific purpose of resale in California to California and West Coast distributors and retailers.  Both KGR and Zest US market, advertise, promote, and distribute such products in the Central District of California.  On information and belief, defendants KGR and Kommi tell California customers that they can buy KGR's products in California from KGR's exclusive distributor Zest US.  KGR and Kommi directly target California and are subject to personal jurisdiction in California.

45.   On information and belief, KGR's actions described herein were authorized, controlled, and directed by defendant Ravi Kommi and other

1  defendants yet to be identified, at all relevant times.  On information and

2  belief, Kommi directly participates in KGR's actions, is the guiding spirit

3  behind KGR's wrongful conduct alleged herein, and is the central figure in the

4  challenged corporate activity alleged against KGR herein.  KGR and Kommi

5  directly target California and are subject to personal jurisdiction in California.

6        46.    On information and belief, Kommi regularly calls and e-mails

7  California distributors and retailers to sell them KGR's products with the

8  knowledge that such distributors and retailers are located in California.  KGR

9  and Kommi directly target California and are subject to personal jurisdiction in

10 California.

11        47.    Until 2021, Kommi regularly sent marketing e-mails to

12 plaintiffs, using his own name as the sender of the e-mails, offering on KGR's

13 behalf to sell KGR's products to Imex in the Central District of California.

14        48.    Until 2021, Kommi regularly called plaintiff Grant, offering on

15 KGR's behalf to sell KGR's products to Imex in the Central District of

16 California.  On information and belief, Kommi knew that plaintiffs were located

17 in Orange County, California.  Grant told Kommi that Imex was not interested,

18 because Imex was selling only its own brands, *i.e.,* the Imex Products.

19 Kommi asked Grant how Imex's brands were selling, and Grant told Kommi

20 that Imex's brands were selling very well.  Kommi asked Grant for information

21 about the Imex Products, and Grant told him to visit Imex's website at

22 eggstime.com, which displays the Imex Products and Imex Trade Dress.

23 Kommi told Grant that he and KGR would become a distributor of Imex

24 Products, but instead, Kommi stopped calling Grant and stopped sending

25 Grant marketing e-mails on KGR's behalf.

26        49.    On information and belief, defendants KGR, Kommi, and

27 other defendants deliberately began creating, designing, manufacturing,

28 importing, shipping, selling, marketing, advertising, promoting, and distributing

COMPLAINT

candy and toy products confusingly similar to the Imex Products.  On information and belief, such defendants started doing so after Kommi stopped contacting Grant.  Such defendants gained access to and knowledge of the Imex Products and the Imex Trade Dress by visiting Imex's website at eggstime.com, which displays the Imex Products and Imex Trade Dress.  On information and belief, such defendants also copied Imex's custom display boxes and racks for use with KGR's similar products.  On information and belief, such defendants chose to market and sell such similar products in order to target Imex's customers in California and elsewhere, and to compete unfairly with Imex.

50.    On information and belief, defendant Shims Bargain, Inc. is located in Los Angeles, California, doing business as JC Sales.  On information and belief, Shims Bargain, Inc. purchases "Cosby Fun," "Toybox Drajebon," and "The Smileys" products exclusively from defendant Zest US within the Central District of California.  On information and belief, Shims Bargain, Inc. purchases foreign-made gray market goods from defendant Zest US within the Central District of California. On information and belief, Zest US ships all such products from its Fullerton warehouse to Shims Bargain, Inc.'s warehouse in Los Angeles.  On information and belief, Shims Bargain, Inc. and other defendants sell, market, advertise, promote, and distribute all such products in the Central District of California.

Defendants' Copying, Acts of Infringement, and Unfair Competition

51.    In or about 2021, plaintiffs discovered that defendants were selling foreign-made candy and toy products in egg-shaped containers that copied the look and feel of the Imex Products and were confusingly similar to the Imex Trade Dress; packaged them for sale in custom display boxes and racks that copied the look and feel of Imex's custom display boxes and racks;

23

COMPLAINT

1    imported and shipped such products into the Central District of California and
2    the United States; and started selling, advertising, marketing, promoting, and
3    distributing such products in the Central District of California and the United
4    States.  On information and belief, defendants began manufacturing and
5    importing defendants' products after defendants gained access to and
6    obtained knowledge of the Imex Products and the Imex Trade Dress and after
7    they stopped buying Imex Products.

8           52.    On information and belief, defendants Zest US, Adil Al
9    Hourani, Omar Al Hourani, and other defendants sell, market, advertise,
10   promote, and distribute "Cosby Fun," "Toybox Drajebon," "The Smileys," "Mr
11   Egg," "Mrs Egg," and "Junior Surprise Eggs" in the Central District of
12   California.  On information and belief, defendants KGR, Kommi, and other
13   defendants sell, market, advertise, promote, and distribute "Cosby Fun" and
14   "Toybox Drajebon" in the Central District of California.  On information and
15   belief, defendants Shims Bargain, Inc. and other defendants sell, market,
16   advertise, promote, and distribute "Cosby Fun," "Toybox Drajebon," and "The
17   Smileys" in the Central District of California.  All such products are collectively
18   referred to herein as the "Accused Products."

19          53.    On information and belief, defendants created, designed,
20   manufactured, imported, shipped, marketed, advertised, distributed, sold, and
21   offered for sale the Accused Products with the purpose to trade on and take
22   advantage of the success, customer recognition, product quality, and goodwill
23   of the Imex Products, to confuse customers as to the source of the Accused
24   Products, and to compete unfairly with Imex.  On information and belief,
25   defendants intentionally searched abroad for products that look like the Imex
26   Products to import into the United States, or intentionally created, designed,
27   and ordered the foreign manufacture of products that look like the Imex
28   //

COMPLAINT

1  Products to import into the United States, in order to compete unfairly with

2  Imex.  This is unfair competition, intentional and in bad faith.

3         54.    The Accused Products and the Imex Products are

4  confusingly similar.  The Accused Products and the Imex Products contain

5  candy and toys packaged in egg-shaped containers of similar shape, size,

6  total image, overall appearance, and look and feel.  The outside of the

7  Accused Products is decorated with characters and story art, just like the

8  Imex Products.  The Accused Products use bright colors and eye-catching

9  fonts, just like the Imex Trade Dress, to attract attention from consumers,

10  especially parents and small children, who are shopping at the point of sale

11  and browsing store shelves for impulse buying.  The class of purchasers for

12  defendants' product and the Imex Products is identical:  consumers of candy

13  and toys.  Defendants copied the look and feel of the Imex Products, with the

14  effect that the Accused Products appear to be part of the same suite of

15  products as the Imex Products.  Consumers viewing the Accused Products

16  are likely to be confused into believing that Imex is the source of the Accused

17  Products.  The Accused Products are described as follows.

18         55.    "Cosby Fun."  Examples of the "Cosby Fun" product are

19  attached as Exhibit E hereto.  The egg-shaped containers for "Cosby Fun" are

20  similar in size to Imex's small-sized eggs.  The front side of the containers

21  feature a large white background on which appear the words "Cosby Fun".

22  The King Egg® suite of products feature a similar large white background.

23  The front side of the "Cosby Fun" containers is divided into three colored

24  areas from top to bottom, similar to the King Egg® and Happy Egg® suites of

25  products.  At the very top of "Cosby Fun" is an area colored in either blue or

26  pink.  The blue color is similar to the shade of blue used on King Egg®

27  "Cutie", Happy Egg® "Geek", and Happy Egg® "Joy".  The pink color is

28  similar to the shade of pink used on King Egg® "Grumpy" and Happy Egg®

COMPLAINT

1    "Hani".  The blue and pink areas on the top of the front side are shaped in an
2    arc and resemble cartoon hair.  The blue version has an arrowhead-shaped
3    cutout on the right side of the blue area, suggesting side-parted hair.  The
4    pink version has a a round cutout in the middle of the blue area, suggesting
5    bangs.  This is similar to the King Egg® and Happy Egg® suites, which
6    feature cartoon hair positioned in the same place at the top of the container.

7            56.    The word "Cosby" is displayed in all capital letters, in a
8    cartoon-style font, in yellow color, outlined in a different color.  The yellow
9    color used to display the word "Cosby" in "Cosby Fun" is similar to the yellow
10   color used for the word "Egg" in the Happy Egg® suite.  The word "Egg" in the
11   King Egg®, Happy Egg®, Emoji Egg®, MagiK Egg®, Lucky Egg®, and
12   Skazka Egg® suites is similarly depicted in all capital letters, in a cartoon-style
13   font, with each letter in a single color, outlined in a different color.  The word
14   "Fun" is displayed in all capital letters, in the same cartoon-style font, with
15   each letter in alternating colors, outlined in a different color.  This is similar to
16   the depiction of the word "Happy" on the Happy Egg® suite and the word
17   "Emoji" on the Emoji Egg® suite, in all capital letters, in a cartoon-style font,
18   with each letter in alternating colors, outlined in a different color.  The use of
19   alternating colors to display the word "Fun" in "Cosby Fun" is similar to the
20   use of alternating colors to display the word "Happy" in the Happy Egg® suite,
21   the word "Emoji" in the Emoji Egg® suite, the word "Lucky" in the Lucky Egg®
22   suite, and the word "Skazka" in the Skazka Egg® suite.  The outlining of
23   letters in a different color is similar to the outlining of letters used in in the King
24   Egg®, Happy Egg®, Emoji Egg®, MagiK Egg®, Lucky Egg®, and Skazka
25   Egg® suites.  Consumers viewing "Cosby Fun" are likely to be confused into
26   believing that Imex is the source of "Cosby Fun".

27           57.    "Toybox Drajebon."  "Toybox Drajebon," which is also sold
28   under the name "Toybox Max," is a direct knockoff of Imex's MagiK Egg®

COMPLAINT

1  suite of products.  The egg-shaped containers for "Toybox Drajebon" are
2  similar in size to Imex's small-sized eggs.  The front side of the containers
3  show a large cartoon face, consisting of large eyes, large pupils, and large
4  mouths.  These faces are similar to the cartoon faces on the MagiK Egg®
5  suite, which also have large eyes, large pupils, and large mouths.  The eyes,
6  pupils, and mouths are similarly sized and proportioned.

7       58.    On information and belief, there are eight varieties of faces
8  on the "Toybox Drajebon" containers.  Each variety has different drawings for
9  the eyes and mouths, and a different solid primary color main background,
10  red, blue, green, purple, orange, or yellow.  These colors are similar to the
11  colors used for the MagiK Egg® suite.

12      59.    Four varieties of "Toybox Drajebon" are labeled "for boys,"
13  and four varieties are labeled "for girls."  This is similar to the MagiK Egg®
14  suite, in which six designs are "for boys" and six designs are "for girls"; the
15  Happy Egg® suite, in which three designs are "for boys" and three designs
16  are "for girls"; and the King Egg® suite, in which six designs are "for boys"
17  and six designs are "for girls."  Examples of the "Toybox Drajebon" product
18  "for boys" are attached as Exhibit F hereto.  Examples of the "Toybox
19  Drajebon" product "for girls" are attached as Exhibit G hereto.

20      60.    The red "Toybox Drajebon for boys" container is a direct
21  knockoff of the MagiK Egg® "Flower" container.  Both feature a cartoon face
22  with two large, wide-open eyes with large pupils.  Both feature mouths
23  consisting of a long line in the shape of an upside-down arc with a depiction of
24  a small partly-opened mouth under the line.  The depiction of two large, wide-
25  open eyes with large pupils is also similar to MagiK Egg® "Autumn", MagiK
26  Egg® "Moon", MagiK Egg® "Ocean", MagiK Egg® "Rainbow", MagiK Egg®
27  "River", MagiK Egg® "Sky", MagiK Egg® "Spring", MagiK Egg® "Sunshine",
28  MagiK Egg® "Winter", Happy Egg® "Captain", Happy Egg® "Hani", Happy

COMPLAINT

Egg® "Joy", Happy Egg® "Merry", both versions of Emoji Egg® "Ace", Emoji Egg® "Cupcake", both versions of Emoji Egg® "Mac", both versions of Emoji Egg® "Magic", both versions of Emoji Egg® "Melody", both versions of Emoji Egg® "Sunshine", King Egg® "Beauty", King Egg® "Candy", King Egg® "Cutie", King Egg® "Dreamy", and King Egg® "Grumpy".  The depiction of the partly-opened mouth is similar to MagiK Egg® "Moon", MagiK Egg® "Ocean", MagiK Egg® "Summer", MagiK Egg® "Sunshine", Happy Egg® "Captain", Happy Egg® "Joy", Happy Egg® "Merry", both versions of Emoji Egg® "Melody", Emoji Egg® "Smiley", King Egg® "Beauty", and King Egg® "Pretty". The red color is similar to the color used for Happy Egg® "Beauty", King Egg® "Beauty", King Egg® "Funny", King Egg® "Pretty", and King Egg® "Sweetie". When combined with the similar face, the red color appears similar to the dark pink color used for MagiK Egg® "Flower".

61.    The purple "Toybox Drajebon for boys" container has a cartoon face with a large single open eye, similar to the large single open eye on MagiK Egg® "Summer."  The cartoon face also shows a closed or winking eye next to the wide-open eye.  This is similar to the winking eye on Emoji Egg® "Smiley" and KingEgg® "Pretty".  The cartoon face uses a curved line in an arc shape to depict a closed-mouthed frown, similar to the frown on MagiK Egg® "Autumn", Emoji Egg® "Chief", the original version of Emoji Egg® "Neo", Emoji Egg® "Twinkie", and King Egg® "Pooky".  The purple color is similar to that used for MagiK Egg® "River", Happy Egg® "Merry", King Egg® "Cricky", and King Egg® "Goofy".

62.    The cartoon face on the green "Toybox Drajebon for boys" container depicts eyes consisting of two lopsided quadrilaterals, each made by connecting four arced lines together, similar to the eyes on both versions of Emoji Egg® "Magic", both versions of Emoji Egg® "Melody", and Emoji Egg® "Twinkie".  The mouth on that cartoon face depicts a tongue sticking out of the

COMPLAINT

mouth, similar to both versions of Emoji Egg® "Fox", King Egg® "Cutie", King Egg® "Goofy", and King Egg® "Sweetie".  The green color is similar to that used for MagiK Egg® "Summer", Happy Egg® "Joy", King Egg® "Dreamy", and King Egg® "Pooky".

63.    The cartoon face on the blue "Toybox Drajebon for boys" container depicts large eyes, a wide open smile, a full row of teeth on the upper part of the mouth, and a tongue on the lower part of the mouth.  This is similar to the eyes and mouth on MagiK Egg® "Rainbow", MagiK Egg® "River", both versions of Emoji Egg® "Hop", both versions of Emoji Egg® "Mac", both versions of Emoji Egg® "Melody", Emoji Egg® "Smiley", both versions of Emoji Egg® "Sunshine", King Egg® "Candy", King Egg® "Funny", and King Egg® "Pretty".  The blue color is similar to the blue used in MagiK Egg® "Ocean" and MagiK Egg® "Winter."

64.    The main difference between the "for boys" and "for girls" varieties of "Toybox Drajebon" is that the cartoon faces on the "for girls" varieties have long eyelashes and fuller lips.  These feminized cartoon faces are similar to the cartoon faces on Happy Egg® "Captain," Happy Egg® "Hani," Happy Egg® "Joy," Happy Egg® "Merry," and Happy Egg® "Victory," which feature big eyes and long eyelashes.  The style of eyelash on the "Toybox Drajebon for girls" containers uses three thick curved black wedges on each eye to depict thick feminized eyelashes.  This is similar to the style of eyelash used for King Egg® "Beauty," King Egg® "Candy," King Egg® "Cricky," King Egg® "Cutie," King Egg® "Dreamy," King Egg® "Funny," King Egg® "Goofy," King Egg® "Grumpy," King Egg® "Pooky," King Egg® "Pretty," King Egg® "Snoopy," King Egg® "Sweetie," which use three such wedges to depict eyelashes, and the style of eyelash on Happy Egg® "Captain" and Happy Egg® "Joy," which use four such wedges.

//

65.    The yellow color used for "Toybox Drajebon for girls" is similar to the color used for MagiK Egg® "Autumn", MagiK Egg® "Sunshine", Happy Egg® "Victory", and all versions of the Emoji Egg® containers.  The orange color used for "Toybox Drajebon for girls" is similar to the color used for MagiK Egg® "Rainbow", King Egg® "Candy", and King Egg® "Funny".  The purple color used for "Toybox Drajebon for girls" is similar to the color used for MagiK Egg® "River", Happy Egg® "Merry", King Egg® "Cricky", and King Egg® "Goofy".  The red color used for "Toybox Drajebon for girls" is similar to the color used for Happy Egg® "Beauty", King Egg® "Beauty", King Egg® "Funny", King Egg® "Pretty", and King Egg® "Sweetie".

66.    The "Toybox" products include puzzles, spinners, and stickers, similar to the Imex Products which include puzzles, spinners, and stickers.

67.    The top third of the front side of each "Toybox Drajebon" container is a different solid color from the main background.  This is similar to the King Egg® and Happy Egg® suites, which also use a different color for the top portion of the container.  The word "Toybox" is prominently displayed within this secondary color background.  This is similar to the King Egg® and Happy Egg® suites, where the registered word marks are also positioned within the secondary color background.  The word "Toybox" appears in all capital letters, in a cartoon-style font, with each letter in alternating colors, outlined in a different color.  This is similar to the depiction of the word "Happy" on the Happy Egg® suite and the word "Emoji" on the Emoji Egg® suite, in all capital letters, in a cartoon-style font, with each letter in alternating colors, outlined in a different color.  The use of alternating colors to display the word "Toybox" is similar to the use of alternating colors to display the word "Happy" in the Happy Egg® suite, the word "Emoji" in the Emoji Egg® suite, the word "Lucky" in the Lucky Egg® suite, and the word "Skazka" in the

30

COMPLAINT

Skazka Egg® suite.  The outlining of letters in a different color is similar to the outlining of letters used in in the King Egg®, Happy Egg®, Emoji Egg®, MagiK Egg®, Lucky Egg®, and Skazka Egg® suites.  Consumers viewing "Toybox Drajebon" are likely to be confused into believing that Imex is the source of "Toybox Drajebon."

68.   "The Smileys."  "The Smileys" is a direct knockoff of Imex's Emoji Egg® suite of products.  Examples of "The Smileys" product are attached as Exhibit H hereto.  The egg-shaped containers for "The Smileys" are similar in size to Imex's small-sized eggs.  The front side of the containers show two cartoon characters whose bodies consist primarily of emoji smiley faces.  This is similar to the Emoji Egg® suite, which prominently features cartoon characters whose bodies consist primarily of emoji smiley faces.  One of the cartoon characters on "The Smileys" container is colored yellow, similar to the yellow cartoon characters in the Emoji Egg® suite.  The cartoon characters on "The Smileys" container have arms, hands, legs, and shoes.  This is similar to the Emoji Egg® suite, whose cartoon characters have arms, hands, legs, and shoes.  The cartoon characters on "The Smileys" container have items on the top of their heads, such as a baseball cap and a bow.  This is similar to the Emoji Egg® suite, whose cartoon characters are all depicted with items on the top of their heads, such as hats or hair.  The smiles on the cartoon characters on "The Smileys" container consist of an upward curved line with two short perpendicular lines at each end.  This is similar to the smiles on both versions of Emoji Egg® "Ace" and Emoji Egg® "Magic" and the new version of Emoji Egg® "Neo".  The yellow cartoon character on "The Smileys" container is portrayed with one open eye and one winking eye, similar to the cartoon character on Emoji Egg® "Smiley".  The purple cartoon character on "The Smileys" container is portrayed with two open eyes and a closed-mouth smile, similar to the cartoon characters on both versions of

31

COMPLAINT

1 Emoji Egg® "Ace" and Emoji Egg® "Magic" and the new version of Emoji
2 Egg® "Neo".  The front side of "The Smileys" containers is divided into two
3 main colored areas from top to bottom, similar to the new versions of the
4 Emoji Egg® suite.

5     69.    The Merriam-Webster Dictionary defines "smiley" as
6 meaning "emoticon."  It defines "emoticon" as "a group of keyboard
7 characters (such as :-)) that typically represents a facial expression or
8 suggests an attitude or emotion and that is used especially in computerized
9 communications (such as email)."  This dictionary defines "emoji" as "any of
10 various small images, symbols, or icons used in text fields in electronic
11 communication (as in text messages, email, and social media) to express the
12 emotional attitude of the writer, convey information succinctly, communicate a
13 message playfully without using words, etc."  The words "smiley", "emoji", and
14 "emoticon" serve similar purposes and have similar meanings.

15     70.    "The Smileys" is also similar to the registered design mark
16 for Eggs Time® shown in Exhibit A.  The design for "The Smileys" consists
17 primarily of a pair of smiling faces, similar to the Eggs Time® design mark,
18 which consists primarily of a pair of smiling faces.

19     71.    The container for "The Smileys" displays the words "The
20 Smileys" in all capital letters, in a cartoon-style font, in a single color, outlined
21 in different colors.  This is similar to the depiction of the word "Egg" on the
22 Emoji Egg®, Happy Egg®, King Egg®, MagiK Egg®, and Skazka Egg® suites
23 of products, in all capital letters, in a cartoon-style font, with each letter in a
24 single color, outlined in a different color.  Consumers viewing "The Smileys"
25 are likely to be confused into believing that Imex is the source of "The
26 Smileys".

27     72.    "Mr Egg" and "Mrs Egg."  These are direct knockoffs of
28 Imex's King Egg® and Happy Egg® suites of products.  Examples of the

"Mr Egg" and "Mrs Egg" products are attached as Exhibit I hereto.  The egg-shaped containers for "Mr Egg" and "Mrs Egg" come in two sizes, small and "mega," which are similar in size to Imex's small-sized and giant-sized eggs, respectively.  The front side of each "Mr Egg" and "Mrs Egg" container prominently features a large cartoon face on a white background, a male version for "Mr Egg" and a female version for "Mrs Egg".  This is similar to the King Egg® suite, which prominently features a large cartoon face on a white background, and the Happy Egg® suite, which prominently features a large cartoon face on light colored backgrounds.  Similar to "Mr Egg" and "Mrs Egg", King Egg®, Happy Egg®, and MagiK Egg® characters also present in male and female versions.

73.    The cartoon faces for both "Mr Egg" and "Mrs Egg" contain two round open eyes, eyebrows, and an open-mouth smile including representations of a top row of teeth and a tongue on the bottom of the mouth.  The two round open eyes are similar to the eyes depicted on Happy Egg® "Captain" and Happy Egg® "Joy".  The eyebrows for the "Mrs Egg" character consist of two thin black arcs curving upwards then downwards.  This is similar to the eyebrows on most of the King Egg® and Happy Egg® characters.  The open-mouth smiles with teeth and tongue on the "Mr Egg" and "Mrs Egg" characters are similar to the smiles depicted on Happy Egg® "Captain", Happy Egg® "Hani", Happy Egg® "Joy", Happy Egg® "Merry", Happy Egg® "Victory", and King Egg® "Funny."

74.    The cartoon faces on both "Mr Egg" and "Mrs Egg" have a representation of brown hair at the top, short with a side part for the male version, and longer with a side part and a bow for the female version.  All of the cartoon faces in the King Egg® and Happy Egg® suites are similarly depicted with hair at the top.  The hair color of King Egg® "Cricky", King Egg® "Dreamy", King Egg® "Grumpy", King Egg® "Pretty", and King Egg®

COMPLAINT

1  "Snoopy" is brown, like the hair on "Mr Egg" and "Mrs Egg", and the brown
2  color on King Egg® "Snoopy" is a very similar shade of dark brown.  The hair
3  on King Egg® "Candy" is depicted with a side part, similar to "Mr Egg" and
4  "Mrs Egg".  King Egg® "Pretty", King Egg® "Sweetie", Happy Egg® "Hani",
5  Happy Egg® "Merry", and Happy Egg® "Victory" have bows in their hair, and
6  King Egg® "Beauty", King Egg® "Candy", King Egg® "Snoopy" have other
7  hair adornments, similar to "Mrs Egg".

8          75.    Similar to the King Egg® and Happy Egg® suites of
9  products, the front side of the "Mr Egg" and "Mrs Egg" containers is divided
10 into separate colored areas from top to bottom.  The bottom half of the
11 containers has a different color background, blue for "Mr Egg" and pink for
12 "Mrs Egg".  The blue color is similar to the blue used in the bottom half of King
13 Egg® "Cutie", King Egg® "Grumpy", and Happy Egg® "Geek".  The pink color
14 is similar to the pink used in the bottom half of Happy Egg® "Hani."  The
15 words "Mr Egg" and "Mrs Egg" appear on the bottom half of the container.
16 The words are displayed in all capital letters, in a cartoon-style font, in a single
17 color, outlined in a different color.  This is similar to the depiction of the word
18 "Egg" on the King Egg®, Happy Egg®, Emoji Egg®, and MagiK Egg® suites
19 of products, in all capital letters, in a cartoon-style font, with each letter in a
20 single color, outlined in a different color.  Consumers viewing "Mr Egg" and
21 "Mrs Egg" are likely to be confused into believing that Imex is the source of
22 "Mr Egg" and "Mrs Egg".

23         76.    "Junior Surprise Eggs."  These are direct knockoffs of Imex's
24 Emoji Egg® suite of products.  Examples of the "Junior Surprise Eggs"
25 product are attached as Exhibit J hereto.  The egg-shaped containers for
26 "Junior Surprise Eggs" are similar in size to Imex's small-sized eggs.  The
27 front side of each "Junior Surprise Eggs" container prominently features a
28 large cartoon face on a large yellow background.  This is similar to the original

1  Emoji Egg® suite of products, which prominently features a large cartoon face
2  on a large yellow background on the front side of each container.

3        77.    On information and belief, there are four versions of the
4  cartoon faces on "Junior Surprise Eggs".  One version has open eyes,
5  eyebrows, nose, and a closed smile.  This is similar to the cartoon faces on
6  the original versions and new versions of Emoji Egg® "Ace" and Emoji Egg®
7  "Magic".  Another version has open eyes, eyebrows, nose, and an partly
8  open-mouthed smile.  This is similar to the original version and new version of
9  Emoji Egg® "Melody."  Another version is feminized and has closed eyes and
10 eyelashes.  This feminized cartoon face is similar to the cartoon faces on
11 Happy Egg® "Captain," Happy Egg® "Hani," Happy Egg® "Joy," Happy Egg®
12 "Merry," and Happy Egg® "Victory," which feature long eyelashes.  The style
13 of eyelash uses two thick curved black wedges on each eye to depict thick
14 feminized eyelashes.  This is similar to the style of eyelash used for King
15 Egg® "Beauty," King Egg® "Candy," King Egg® "Cricky," King Egg® "Cutie,"
16 King Egg® "Dreamy," King Egg® "Funny," King Egg® "Goofy," King Egg®
17 "Grumpy," King Egg® "Pooky," King Egg® "Pretty," King Egg® "Snoopy," King
18 Egg® "Sweetie," which use three such wedges to depict eyelashes, and
19 Happy Egg® "Captain" and Happy Egg® "Joy," which use four such wedges.
20 The closed eyes are similar to both versions of Emoji Egg® "Hop".  Another
21 version has sunglasses, eyebrows, and nose.  The use of sunglasses is
22 similar to Emoji Egg® "Chief".

23        78.    The words "Junior Surprise Eggs" are displayed below the
24 large cartoon face on each container.  This is similar to the positioning of the
25 word marks in the King Egg®, Happy Egg®, Emoji Egg®, MagiK Egg®, and
26 Skazka Egg® suites of products.  The word "Junior" is displayed in a cartoon-
27 style font, in a single color, outlined in a different color.  This is similar to the
28 depiction of the word "Egg" on the King Egg®, Happy Egg®, Emoji Egg®,

35

COMPLAINT

MagiK Egg®, and Skazka Egg® suites of products, in all capital letters, in a cartoon-style font, with each letter in a single color, outlined in a different color. The "J" and "R" at the beginning and end of the word "Junior" are in a larger font size than the remaining letters in the word "Junior."  This is similar to how the word "Skazka" is presented in the Skazka Egg® suite, where the "S" and "A" at the beginning and end of the word "Skazka" are in a larger font size than the remaining letters in the word "Skazka."  Below the word "Junior" appear the words "Surprise Eggs" in a smaller font size, in all capital letters, in a single color.  This is similar to the way the word "Egg" is presented in the Emoji Egg® and Skazka Egg® suites, below the words "Emoji" and "Skazka", in a smaller font size, in all capital letters, in a single color.  Consumers viewing "Junior Surprise Eggs" are likely to be confused into believing that Imex is the source of "Junior Surprise Eggs".

79.   Defendants also copied the look and feel of Imex's custom display boxes.  Imex's display boxes have a backdrop displaying the identifying Registered Word Mark for a suite of characters, images of various characters and egg-shaped containers in the suite, and other trademarks and slogans associated with Imex Products.  Defendants' display boxes for the Accused Products mimic Imex's display boxes, with a backdrop displaying the product name and images of their different egg-shaped containers.  Consumers viewing the display boxes for the Accused Products are likely to be confused into believing that Imex is the source of the Accused Products.

80.   Defendants also copied the look and feel of Imex's custom display racks.  Defendants' display racks are tall, freestanding, open in the front to display the egg-shaped containers, and decorated with the brand name and product images or cute cartoons and designs to attract parents and children.  They are designed to be assembled and stand freely in store aisles to display the egg-shaped containers to shoppers.  This is similar to Imex's

COMPLAINT

custom display racks, which are of similar height, freestanding, open in the front to display the Imex Products, decorated with the Registered Word Marks and images showing the Imex Trade Dress, and designed to be assembled and stand freely in store aisles to display the egg-shaped containers to shoppers.  Consumers viewing the display racks for the Accused Products are likely to be confused into believing that Imex is the source of the Accused Products.  Examples of defendants' similar display boxes and racks are shown in Exhibit K hereto.

81.    Defendants sell and distribute the Accused Products to retail outlets, such as grocery markets and convenience stores, for resale to consumers.  The Accused Products are typically placed on the same store shelves as the Imex Products, near checkout, in the candy and confectionery aisles, and in aisles featuring novelty items.  If a retailer sells both Accused Products and Imex Products, it is likely that such products will be displayed on the same store shelves, and possibly right next to each other.  Both the Accused Products and the Imex Products are similar in appearance, identical in function, inexpensively priced, and subject to impulse buying.  The typical purchaser is a parent with small children.  On information and belief, small children may select the product, and their parents will make the purchase.  On information and belief, small children are even more likely to be confused by the similarity between the Accused Products and the Imex Products.

82.    On information and belief, consumers are initially confused when they see the Accused Products on store shelves.  On information and belief, consumers will be initially drawn to the Accused Products, believing them to be Imex Products or confusing them with the Imex Products, before consumers have any opportunity to recognize or clarify that it may come from a different source.  On information and belief, consumers often purchase the product without carefully reading the front and back sides of the egg-shaped

container to determine the actual identity of the manufacturer or distributor of the product.  On information and belief, although some consumers may be able to confirm the source of the product after close visual inspection of the back side of the egg-shaped container, or by conducting independent research outside of the point of sale, many will buy the Accused Products anyway, having originally been drawn to them by initial interest confusion.  On information and belief, consumers are actually confused as to the source of defendants' product.

83.    On information and belief, defendants directly misled consumers as to the source of the Accused Products by using Imex's own custom display racks to display and sell Accused Products to retail customers. An example is shown in Exhibit L attached hereto.

84.    Visual comparisons of the Accused Products and the Imex Trade Dress are attached in Exhibit L hereto.

85.    The effect of defendants' copying of the look and feel of the Imex Products and Imex Trade Dress is to associate the Accused Products with the Imex Products and to confuse and mislead consumers as to the source of the Accused Products.  Consumers are likely to purchase the Accused Products under the mistaken belief that they are Imex Products or associated with Imex.

86.    The likelihood of confusion is disparaging and damaging to plaintiffs' trademarks and brands.  Consumers trust in the safety and high quality of the Imex Products and their contents.  On information and belief, defendants charged retailers a lower price for Accused Products as compared to the Imex Products.  On information and belief, the egg-shaped containers for the Accused Products and the candy and toys placed inside them are cheaper and of lower quality.  On information and belief, some consumers are disappointed when they open the Accused Products' containers and can

COMPLAINT

finally see, taste, and play with the "surprise" candy and toys found within the Accused Products.  On information and belief, this leads to declining sales of the Accused Products, and retailers stop stocking them.  When Imex approaches the same retailers to purchase and stock Imex Products, retailers decline, telling plaintiffs that the Accused Products do not sell well and that the Imex Products are "the same."  Retailers are less likely to purchase and stock Imex Products under the mistaken belief that the Accused Products are the same as Imex Products, or that the Accused Products are associated with Imex, or that Imex is the source of the Accused Products, causing damage to plaintiffs.

87.     Imex's Happy Egg® and Lucky Egg® products have vitamins as part of the nutritional content. It is a more expensive process to add vitamins to a candy product.  On information and belief, the Accused Products do not include vitamins.

88.     Defendant Zest US has an online store at domain name zestus.us.  Defendant KGR has an online store at www.kgrcandies.com, a Facebook page at @kgrdistribution1, and an Instagram page at @kgrcandies. Defendant Shims Bargain, Inc. has an online store at www.jcsalesweb.com and a Facebook page at @jc.sales.35.  On information and belief, defendants use their online stores, social media, and other methods to advertise the Accused Products.  On information and belief, defendants took photos of the Accused Products and uploaded or caused third parties to upload such photos to their online stores and social media for public display on the Internet to advertise and market the Accused Products to consumers, retail markets, and subdistributors.

89.     On information and belief, defendants have intentionally and in bad faith used the Imex Trade Dress, the Registered Word Marks, the Registered Design Marks, the Registered Copyrighted Works, and the

39

COMPLAINT

Unregistered Trade Dress and Trademarks in a manner likely to confuse consumers, without plaintiffs' consent.  On information and belief, defendants copied the Imex Trade Dress, the Registered Design Marks, the Registered Copyrighted Works, and the Unregistered Trade Dress and Trademarks, without plaintiffs' consent.  On information and belief, defendants created, designed, manufactured, imported, shipped, marketed, advertised, distributed, sold, and offered for sale the Accused Products in order to trade off the goodwill associated with the Imex Products, the Imex Trade Dress, the Registered Word Marks, the Registered Design Marks, the Registered Copyrighted Works, and the Unregistered Trade Dress and Trademarks.  On information and belief, defendants are marketing, advertising, selling, and offering for sale the Accused Products in the Central District of California and throughout the United States.

90.    Plaintiff sent written demands to defendants Zest US and and Shims Bargain, Inc. on May 6, 2022, and to defendant KGR on May 16, 2022, demanding that defendants cease and desist immediately from manufacturing, importing, shipping, marketing, selling, or distributing the Accused Products in the United States, and immediately to destroy all such product and related packaging and marketing materials currently in existence. Plaintiffs warned defendants that if defendants did not comply with the demand to cease and desist, plaintiffs reserved the right to file a lawsuit against defendants for trademark and trade dress infringement, unfair competition, copyright infringement, and other claims, to seek injunctive relief to compel the termination of manufacturing, importing, shipping, marketing, selling, and distributing defendants' product, and to seek and obtain monetary damages and other remedies.

91.    Defendants Zest US and KGR rejected plaintiffs' demands to cease and desist by letters dated May 12, 2022 and May 19, 2022 and by

COMPLAINT

e-mail dated June 6, 2022.  Defendant Shims Bargain, Inc. did not respond directly to plaintiffs, but on information and belief it forwarded plaintiffs' written demand to the other defendants.  Despite plaintiffs' demand for defendants to cease and desist, defendants continue to import, ship, market, advertise, sell, and offer to sell the Accused Products in the Central District of California and the United States.  On information and belief, KGR continued to supply Accused Products to Zest US, and Zest US continued to supply Accused Products to Shims Bargain, Inc., with and despite their knowledge or reason to know that all such defendants were infringing plaintiffs' trademarks, trade dress, and copyrights.

92.    On information and belief, defendants have committed their infringing acts in bad faith, without authorization and with the intent to deceive consumers and the general public.  Plaintiffs suffered and will continue to suffer substantial and irreparable harm to the reputation and goodwill associated with the Imex Products, the Imex Trade Dress, the Registered Word Marks, the Registered Design Marks, the Registered Copyrighted Works, and the Unregistered Trade Dress and Trademarks, as a result of defendants' infringing activities and unfair competition.

93.    Defendants' practice of marketing, advertising, distributing, selling, and offering for sale the Accused Products alongside gray market goods and other goods in violation of other trademark owners' rights causes harm to the reputation and goodwill associated with the Imex Products and the Imex Trade Dress.  On information and belief, defendant Zest US imports and distributes substandard products from China and elsewhere bearing widely-known trademarks such as Peppa Pig, PAW Patrol, SpongeBob SquarePants, Frozen, The Avengers, Barbie, L.O.L. Surprise, and Tom & Jerry, without license to do so from the trademark owners.  On information and belief, Zest US sells these products all over California, including to

41

defendant Shims Bargain, Inc., which sells them in California.  On information and belief, defendant KGR imports products from Turkey and elsewhere bearing widely-known trademarks such as Dora The Explorer, PAW Patrol, SpongeBob SquarePants, Barbie, Baby Shark, and The Avengers, and imports foreign-made gray market goods of companies such as Ferrero and Mondelez, and sells and distributes those products in the United States, without the trademark owners' authorization to import and sell such foreign-made products in the United States.  On information and belief, KGR ships these products to California and sells them to Zest US, which sells them all over California including to defendant Shims Bargain, Inc., which sells them in California.  On information and belief, the foregoing products imported by Zest US and KGR are not licensed or authorized by the trademark owners, do not comply with FDA requirements for ingredient lists and nutrition facts, and are of substandard quality.  On information and belief, consumers are misled as to the source of all these products.  On information and belief, the reputation and goodwill of the Imex Products and the Imex Trade Dress are tarnished by defendants' practice of associating poor quality Accused Products with substandard and unauthorized gray market goods and other products, and customer confusion as to the source of all defendants' products, within the Central District of California and the United States.

Control Person Defendants

94.    As alleged in Paragraph 42 above, on information and belief, defendant Zest US's actions described herein, including all actions infringing the Imex Trade Dress, the Registered Word Marks, the Registered Design Marks, the Registered Copyrighted Works, and the Unregistered Trade Dress and Trademarks, were authorized, controlled, and directed at all relevant times by defendant Adil Al Hourani, defendant Omar Al Hourani, and other

42

1   defendants yet to be identified, all of whom derived economic benefit and
2   profit from Zest US's actions and infringements.  On information and belief,
3   defendants Adil Al Hourani and Omar Al Hourani are cousins.  Defendants
4   Adil Al Hourani and Omar Al Hourani, along with other defendants yet to be
5   identified, are the moving, active, conscious force behind Zest US's
6   infringements of the Imex Products, the Imex Trade Dress, the Registered
7   Word Marks, the Registered Design Marks, the Registered Copyrighted
8   Works, and the Unregistered Trade Dress and Trademarks.  On information
9   and belief, defendants Adil Al Hourani and Omar Al Hourani, along with other
10  defendants yet to be identified, have full knowledge of the Imex Products, the
11  design of the Imex Trade Dress, and the success, customer recognition,
12  product quality, and goodwill of the Imex Products and the Imex Trade Dress.

13          95.    On information and belief, defendants Adil Al Hourani and
14  Omar Al Hourani, along with other individual defendants yet to be identified,
15  directly infringed the Imex Products, the Imex Trade Dress, the Registered
16  Word Marks, the Registered Design Marks, the Registered Copyrighted
17  Works, and the Unregistered Trade Dress and Trademarks as alleged herein.
18  On information and belief, defendants Adil Al Hourani and Omar Al Hourani,
19  along with other individual defendants yet to be identified, made the decision
20  for Zest US to become the California and West Coast exclusive distributor for
21  defendant KGR and to purchase from KGR and resell in California the "Cosby
22  Fun" and "Toybox Drajebon" products, with knowledge that such products
23  copied and were confusingly similar to the Imex Products and the Imex Trade
24  Dress.  On information and belief, defendants Adil Al Hourani and Omar Al
25  Hourani, along with other individual defendants yet to be identified, personally
26  created and designed, or personally authorized and approved the creation
27  and design of, or personally searched for and obtained from foreign sources,
28  other Accused Products with knowledge that defendants were copying the

43

1 Imex Products and the Imex Trade Dress in designing or obtaining such

2 products.  On information and belief, defendants Adil Al Hourani and Omar Al

3 Hourani, along with other individual defendants yet to be identified,

4 intentionally copied the look and feel of the Imex Products and the Imex Trade

5 Dress, with the effect that the Accused Products appear to be part of the

6 same suite of products as the Imex Products.

7          96.    On information and belief, defendants Adil Al Hourani and

8 Omar Al Hourani, along with other individual defendants yet to be identified,

9 hired the shipping companies and trucking companies used by Zest US to

10 transport the "Cosby Fun" and "Toybox Drajebon" products to the warehouse

11 shared by Zest US and KGR in Fullerton, California within the Central District

12 of California, directly sent such companies' information to KGR, directly sent

13 shipment information to such companies and KGR, directly sent such

14 companies to pick up such products, and directly sent payments and deposits

15 to such companies.  On information and belief, defendants Adil Al Hourani

16 and Omar Al Hourani, along with other individual defendants yet to be

17 identified, physically unloaded or caused to be physically unloaded such

18 products upon arrival at the warehouse shared by Zest US and KGR in

19 Fullerton, California.

20          97.    On information and belief, defendants Adil Al Hourani and

21 Omar Al Hourani, along with other individual defendants yet to be identified,

22 directly ordered Accused Products from overseas factories, directly approved

23 the designs of such products, and directly sent payments and deposits to

24 those factories to order such products.

25          98.    On information and belief, defendants Adil Al Hourani and

26 Omar Al Hourani, along with other individual defendants yet to be identified,

27 hired the shipping companies used by Zest US to import and ship Accused

28 Products from overseas factories to the warehouse shared by Zest US and

1  KGR in Fullerton, California within the Central District of California, directly
2  sent the shipping companies' information to the factories, directly sent
3  shipment information to the shipping companies and the factories, and directly
4  sent payments and deposits to the shipping companies.

5         99.   On information and belief, defendants Adil Al Hourani and
6  Omar Al Hourani, along with other individual defendants yet to be identified,
7  directly paid all port fees and customs fees for shipping containers of Accused
8  Products on their arrival at the port of entry in the United States.  On
9  information and belief, defendants Adil Al Hourani and Omar Al Hourani, along
10  with other individual defendants yet to be identified, hired the trucking
11  companies used to transport Accused Products from the port of entry to
12  defendants' warehouse, directly sent the container information to the trucking
13  companies, directly sent the trucking companies to the port of entry to pick up
14  the shipping containers, and directly sent payments and deposits to the
15  trucking companies.  On information and belief, defendants Adil Al Hourani
16  and Omar Al Hourani, along with other individual defendants yet to be
17  identified, physically unloaded or caused to be physically unloaded the
18  shipping containers of Accused Products upon arrival at the warehouse
19  shared by Zest US and KGR in Fullerton, California.

20         100.  On information and belief, defendants Adil Al Hourani and
21  Omar Al Hourani, along with other individual defendants yet to be identified,
22  are bringing Accused Products to retail outlets, offering such product for sale
23  to the retailers, making the sales and receiving payment from retailers, setting
24  up such products on store shelves, and placing advertising and marketing
25  materials for such products in retail outlets for display to consumers at the
26  point of sale.

27         101.  On information and belief, defendants Adil Al Hourani and
28  Omar Al Hourani, along with other individual defendants yet to be identified,

COMPLAINT

personally created and designed, or personally authorized and approved the
creation and design of, advertising and marketing materials for Accused
Products.  On information and belief, defendants Adil Al Hourani and Omar Al
Hourani, along with other individual defendants yet to be identified, set up or
caused to be set up Zest US's online store at zestus.us and (on information
and belief) other social media to advertise Accused Products.  On information
and belief, defendants Adil Al Hourani and Omar Al Hourani, along with other
individual defendants yet to be identified, set up or caused to be set up Zest
US's exhibition booths at trade shows displaying Accused Products.  On
information and belief, defendants Adil Al Hourani and Omar Al Hourani, along
with other individual defendants yet to be identified, personally took or caused
to be taken photos of Accused Products, decided what photos of such
products will be displayed on the Internet; and directly uploaded or caused
third parties to upload such photos to the online store and social media for
public display on the Internet to advertise and market Accused Products to
consumers.

102.  On information and belief, defendants Adil Al Hourani and
Omar Al Hourani, along with other individual defendants yet to be identified,
personally profit from sales of Accused Products.

103.  As alleged in Paragraph 45 above, on information and belief,
defendant KGR's actions described herein, including all actions infringing the
Imex Trade Dress, the Registered Word Marks, the Registered Design Marks,
the Registered Copyrighted Works, and the Unregistered Trade Dress and
Trademarks, were authorized, controlled, and directed at all relevant times by
defendant Ravi Kommi and other defendants yet to be identified, all of whom
derived economic benefit and profit from KGR's actions and infringements.
Defendant Ravi Kommi, along with other defendants yet to be identified, is the
moving, active, conscious force behind KGR's infringements of the Imex

46

COMPLAINT

Products, the Imex Trade Dress, the Registered Word Marks, the Registered Design Marks, the Registered Copyrighted Works, and the Unregistered Trade Dress and Trademarks.  On information and belief, defendant Ravi Kommi, along with other defendants yet to be identified, has full knowledge of the Imex Products, the design of the Imex Trade Dress, and the success, customer recognition, product quality, and goodwill of the Imex Products and the Imex Trade Dress.

104.  On information and belief, defendant Ravi Kommi, along with other individual defendants yet to be identified, directly infringed the Imex Products, the Imex Trade Dress, the Registered Word Marks, the Registered Design Marks, the Registered Copyrighted Works, and the Unregistered Trade Dress and Trademarks as alleged herein.  On information and belief, defendant Ravi Kommi, along with other individual defendants yet to be identified, made the decision for KGR to contract with Zest US for Zest US to become the California and West Coast exclusive distributor for KGR, and made the decision for KGR to sell and distribute to Zest US for resale in California the "Cosby Fun" and "Toybox Drajebon" products, with knowledge that such products copied and were confusingly similar to the Imex Products and the Imex Trade Dress.  On information and belief, defendant Ravi Kommi, along with other individual defendants yet to be identified, personally created and designed, or personally authorized and approved the creation and design of, or personally searched for and obtained from foreign sources, the "Cosby Fun" and "Toybox Drajebon" products with knowledge that defendants were copying the Imex Products and the Imex Trade Dress in designing or obtaining such products.  On information and belief, defendant Ravi Kommi, along with other individual defendants yet to be identified, intentionally copied the look and feel of the Imex Products and the Imex Trade Dress, with the //

47

COMPLAINT

1  effect that the "Cosby Fun" and "Toybox Drajebon" products appear to be part
2  of the same suite of products as the Imex Products.

3       105.  On information and belief, defendant Ravi Kommi, along with
4  other individual defendants yet to be identified, directly ordered the "Cosby
5  Fun" and "Toybox Drajebon" products from overseas factories, directly
6  approved the designs of such products, and directly sent payments and
7  deposits to those factories to order such products.

8       106.  On information and belief, defendant Ravi Kommi, along with
9  other individual defendants yet to be identified, hired the shipping companies
10  used by KGR to import and ship the "Cosby Fun" and "Toybox Drajebon"
11  products from overseas factories into the United States, directly sent the
12  shipping companies' information to the factories, directly sent shipment
13  information to the shipping companies and the factories, and directly sent
14  payments and deposits to the shipping companies.

15       107.  On information and belief, defendant Ravi Kommi, along with
16  other individual defendants yet to be identified, directly paid all port fees and
17  customs fees for shipping containers of the "Cosby Fun" and "Toybox
18  Drajebon" products on their arrival at the port of entry in the United States.
19  On information and belief, defendant Ravi Kommi, along with other individual
20  defendants yet to be identified, hired the trucking companies used to transport
21  the "Cosby Fun" and "Toybox Drajebon" products from the port of entry to
22  defendants' warehouse, directly sent the container information to the trucking
23  companies, directly sent the trucking companies to the port of entry to pick up
24  the shipping containers, and directly sent payments and deposits to the
25  trucking companies.  On information and belief, defendant Ravi Kommi, along
26  with other individual defendants yet to be identified, physically unloaded or
27  caused to be physically unloaded the shipping containers of the "Cosby Fun"
28  and "Toybox Drajebon" products upon arrival at defendants' warehouse.

COMPLAINT

1         108.  On information and belief, defendant Ravi Kommi, along with
2   other individual defendants yet to be identified, hired the shipping companies
3   and trucking companies used by KGR to ship the "Cosby Fun" and "Toybox
4   Drajebon" products to the warehouse shared by Zest US and KGR in
5   Fullerton, California within the Central District of California, directly sent such
6   companies' information to Zest US, directly sent shipment information to such
7   companies and Zest US, and directly sent payments and deposits to such
8   companies.

9         109.  On information and belief, defendant Ravi Kommi, along with
10  other individual defendants yet to be identified, are bringing the "Cosby Fun"
11  and "Toybox Drajebon" products to retail outlets, offering such product for sale
12  to the retailers, making the sales and receiving payment from retailers, setting
13  up such products on store shelves, and placing advertising and marketing
14  materials for such products in retail outlets for display to consumers at the
15  point of sale.

16        110.  On information and belief, defendant Ravi Kommi, along with
17  other individual defendants yet to be identified, personally created and
18  designed, or personally authorized and approved the creation and design of,
19  advertising and marketing materials for the "Cosby Fun" and "Toybox
20  Drajebon" products.  On information and belief, defendant Ravi Kommi, along
21  with other individual defendants yet to be identified, set up or caused to be set
22  up KGR's online store at www.kgrcandies.com, its Facebook page at
23  @kgrdistribution1, its Instagram page at @kgrcandies, and (on information
24  and belief) other social media to advertise the "Cosby Fun" and "Toybox
25  Drajebon" products.  On information and belief, defendant Ravi Kommi, along
26  with other individual defendants yet to be identified, set up or caused to be set
27  up KGR's exhibition booths at trade shows displaying "Cosby Fun" and
28  "Toybox Drajebon" products.  On information and belief, defendant Ravi

COMPLAINT

1   Kommi, along with other individual defendants yet to be identified, personally

2   took or caused to be taken photos of the "Cosby Fun" and "Toybox Drajebon"

3   products; decided what photos of such products will be displayed on the

4   Internet; and directly uploaded or caused third parties to upload such photos

5   to the online store and social media for public display on the Internet to

6   advertise and market the "Cosby Fun" and "Toybox Drajebon" products to

7   consumers.

8          111.  On information and belief, defendant Ravi Kommi personally

9   calls and e-mails distributors to offer and sell them KGR's products, including

10   without limitation the "Cosby Fun" and "Toybox Drajebon" products.

11          112.  On information and belief, defendant Ravi Kommi, along with

12   other individual defendants yet to be identified, personally profits from sales of

13   the "Cosby Fun" and "Toybox Drajebon" products.

14

15                  ***FIRST CLAIM FOR RELIEF***

16                ***TRADEMARK INFRINGEMENT***

17               ***UNDER 15 U.S.C. § 1114***

18          113.  Plaintiffs hereby incorporate by reference paragraphs 1

19   through 112 above, as if fully set forth herein.

20          114.  Plaintiff Grant owns the Registered Word Marks set forth in

21   Paragraph 28 above and the Registered Design Marks set forth in Paragraph

22   29 above; registered such marks with the U.S. Patent and Trademark Office;

23   and exclusively licenses all such registered marks to plaintiff Imex.  Such

24   registrations are valid and enforceable.

25          115.  Plaintiffs did not authorize defendants to create, advertise,

26   market, distribute, or sell the Accused Products or to copy the Imex Trade

27   Dress in any way.

28   //

COMPLAINT

1      116.  The Accused Products are confusingly similar to the

2  Registered Design Marks.  By creating, designing, manufacturing, importing,

3  shipping, marketing, advertising, distributing, selling, and offering for sale the

4  Accused Products, by copying and colorably imitating the Registered Design

5  Marks in the Accused Products, and by applying such copies and colorable

6  imitations to labels, signs, prints, packages, wrappers, receptacles, and

7  advertisements intended to be used in commerce upon or in connection with

8  the sale, offering for sale, distribution, and advertising of the Accused

9  Products, without plaintiffs' authorization or consent, defendants used and are

10  using the Registered Design Marks in commerce in a manner likely to confuse

11  consumers and the general public as to the source, sponsorship, affiliation, or

12  approval of the Accused Products.

13      117.  By mixing Accused Products and Imex Products together on

14  store shelves and in Imex's custom display boxes and racks, and by using

15  Imex's custom display boxes and racks to sell Accused Products, without

16  plaintiffs' authorization or consent, defendants used and are using the

17  Registered Word Marks and Registered Design Marks in commerce in a

18  manner likely to confuse consumers and the general public as to the source,

19  sponsorship, affiliation, and approval of the Accused Products.

20      118.  Defendants' activities as described herein are likely to cause

21  confusion, to cause mistake, or to deceive as to source, affiliation, or

22  sponsorship, in violation of the Lanham Act, 15 U.S.C. § 1114.

23      119.  Defendants KGR, Kommi, Adil Al Hourani, Omar Al Hourani,

24  and other defendants intentionally induced Zest US to infringe plaintiffs'

25  trademarks and trade dress.  Defendants Kommi, Zest US, Adil Al Hourani,

26  Omar Al Hourani, and other defendants intentionally induced KGR to infringe

27  plaintiffs' trademarks and trade dress.  Defendants KGR, Kommi, Zest US,

28  Adil Al Hourani, Omar Al Hourani, and other defendants intentionally induced

COMPLAINT

Shims Bargain, Inc. to infringe plaintiffs' trademarks and trade dress.  KGR continued to supply Accused Products to Zest US with knowledge or reason to know that Zest US was engaging in infringement of plaintiffs' trademarks and trade dress.  Zest US continued to supply Accused Products to Shims Bargain, Inc., with knowledge or reason to know that Shims Bargain, Inc. was engaging in infringement of plaintiffs' trademarks and trade dress. Defendants KGR, Kommi, Zest US, Adil Al Hourani, Omar Al Hourani, and other defendants knowingly participated in a scheme to infringe plaintiffs' trademarks and trade dress, carried out by all such defendants.

120.   Defendants KGR, Kommi, Zest US, Adil Al Hourani, Omar Al Hourani, and other defendants have an apparent or actual partnership with respect to Accused Products, have authority to bind one another in transactions with third parties with respect to Accused Products, and exercise joint ownership or control over Accused Products.

121.   Defendants Adil Al Hourani, Omar Al Hourani, and other defendants are the moving, active conscious forces behind Zest US's infringement of plaintiffs' trademarks and trade dress and directly participated in the infringement of plaintiffs' trademarks and trade dress alleged herein.

122.   Defendant Kommi and other defendants are the moving, active, conscious forces behind KGR's infringement of plaintiffs' trademarks and trade dress and directly participated in the infringement of plaintiffs' trademarks and trade dress alleged herein.

123.   Defendants infringed the Registered Word Marks and Registered Design Marks with knowledge of plaintiffs' exclusive rights in those marks, and despite actual notice of infringement.  On information and belief, defendants' conduct is willful, deliberate, intentional, and in bad faith, making this an exceptional case.

//

124.  As a direct and proximate result of defendants' trademark infringement, plaintiffs suffered damage in an amount to be proved at trial, but not less than Five Million Dollars ($5,000,000).  Plaintiffs are entitled to an accounting and disgorgement of profits in connection with the Accused Products.

125.  As a direct and proximate result of defendants' trademark infringement, defendants have caused, and will continue to cause, irreparable harm to plaintiffs and the goodwill associated with the Registered Word Marks and the Registered Design Marks, for which plaintiffs have no adequate remedy at law.  Plaintiffs are entitled to injunctive relief against continuing infringements under 15 U.S.C. § 1116, destruction of infringing items under 15 U.S.C.  § 1117, and a sworn report of defendants' compliance under 15 U.S.C.  § 1116(a).

126.  Under the circumstances described herein, defendants will be unjustly enriched if they are allowed to profit by their wrongful conduct. Therefore, plaintiffs are entitled to a constructive trust on, and disgorgement of, all funds, assets, accounts, and business opportunities unjustly acquired by defendants.

### ***SECOND CLAIM FOR RELIEF***
### ***UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN***
### ***UNDER 15 U.S.C. § 1125(a)***

127.  Plaintiffs hereby incorporate by reference paragraphs 1 through 126 above, as if fully set forth herein.

128.  Plaintiff Grant and, as exclusive licensee, plaintiff Imex own and have acquired common law and federal trademark rights in the Imex Trade Dress, the Registered Word Marks, the Registered Design Marks, and the Unregistered Trade Dress and Trademarks.

COMPLAINT

129.  Plaintiffs did not authorize defendants to create, advertise, market, distribute, or sell the Accused Products or to copy the Imex Trade Dress in any way.

130.  The Accused Products copy the total image, overall appearance, and look and feel of the Imex Trade Dress.  The Imex Trade Dress is distinctive and nonfunctional.  The trade dress of the Accused Products is confusingly similar to the Imex Trade Dress, creating a likelihood of confusion between the Accused Products and the Imex Products.

131.  Defendants used and are using, without plaintiffs' authorization or consent, the Imex Trade Dress, the Registered Word Marks, the Registered Design Marks, and the Unregistered Trade Dress and Trademarks, and colorable imitations thereof, in connection with the Accused Products, in a manner likely to confuse consumers and the general public as to the source, sponsorship, affiliation, or approval of the Accused Products, and made and are making false designations of origin, false or misleading descriptions of fact, and false or misleading representations of fact, which are likely to cause confusion, to cause mistake, and to deceive as to the affiliation, connection, or association of defendants and their product with plaintiffs, the Imex Products, and the Imex Trade Dress, and as to the origin, sponsorship, or approval of the Accused Products or defendants' commercial activities relating to the Accused Products.

132.  Defendants infringed plaintiffs' trademarks and trade dress and are unfairly competing with Imex with knowledge of plaintiffs' exclusive rights in such trademarks and trade dress, and despite actual notice of infringement.  Defendants' conduct is willful, deliberate, intentional, and in bad faith.

133.  Defendants KGR, Kommi, Adil Al Hourani, Omar Al Hourani, and other defendants intentionally induced Zest US to infringe plaintiffs'

1   trademarks and trade dress.  Defendants Kommi, Zest US, Adil Al Hourani,

2   Omar Al Hourani, and other defendants intentionally induced KGR to infringe

3   plaintiffs' trademarks and trade dress.  Defendants KGR, Kommi, Zest US,

4   Adil Al Hourani, Omar Al Hourani, and other defendants intentionally induced

5   Shims Bargain, Inc. to infringe plaintiffs' trademarks and trade dress.  KGR

6   continued to supply Accused Products to Zest US with knowledge or reason

7   to know that Zest US was engaging in infringement of plaintiffs' trademarks

8   and trade dress.  Zest US continued to supply Accused Products to Shims

9   Bargain, Inc., with knowledge or reason to know that Shims Bargain, Inc. was

10   engaging in infringement of plaintiffs' trademarks and trade dress.

11   Defendants KGR, Kommi, Zest US, Adil Al Hourani, Omar Al Hourani, and

12   other defendants knowingly participated in a scheme to infringe plaintiffs'

13   trademarks and trade dress, carried out by all such defendants.

14       134.  Defendants KGR, Kommi, Zest US, Adil Al Hourani, Omar Al

15   Hourani, and other defendants have an apparent or actual partnership with

16   respect to Accused Products, have authority to bind one another in

17   transactions with third parties with respect to Accused Products, and exercise

18   joint ownership or control over Accused Products.

19       135.  Defendants Adil Al Hourani, Omar Al Hourani, and other

20   defendants are the moving, active conscious forces behind Zest US's

21   infringement of plaintiffs' trademarks and trade dress and directly participated

22   in the infringement of plaintiffs' trademarks and trade dress alleged herein.

23       136.  Defendant Kommi and other defendants are the moving,

24   active, conscious forces behind KGR's infringement of plaintiffs' trademarks

25   and trade dress and directly participated in the infringement of plaintiffs'

26   trademarks and trade dress alleged herein.

27       137.  As a direct and proximate result of defendants' trademark

28   and trade dress infringement and unfair competition, plaintiffs suffered

damage in an amount to be proved at trial, but not less than Five Million Dollars ($5,000,000).  Plaintiffs are entitled to an accounting and disgorgement of profits in connection with the Accused Products.

138.  As a direct and proximate result of defendants' trademark and trade dress infringement and unfair competition, defendants have caused, and will continue to cause, irreparable harm to plaintiffs and the goodwill associated with the Imex Trade Dress, the Registered Word Marks, the Registered Design Marks, and the Unregistered Trade Dress and Trademarks, for which plaintiffs have no adequate remedy at law.  Plaintiffs are entitled to injunctive relief against continuing infringements under 15 U.S.C. § 1116, destruction of infringing items under 15 U.S.C. § 1117, and a sworn report of defendants' compliance under 15 U.S.C. § 1116(a).

139.  Under the circumstances described herein, defendants will be unjustly enriched if they are allowed to profit by their wrongful conduct. Therefore, plaintiffs are entitled to a constructive trust on, and disgorgement of, all funds, assets, accounts, and business opportunities unjustly acquired by defendants.

### ***THIRD CLAIM FOR RELIEF***
### ***COMMON LAW TRADEMARK INFRINGEMENT***

140.  Plaintiffs hereby incorporate by reference paragraphs 1 through 139 above, as if fully set forth herein.

141.  Plaintiff Grant and, as exclusive licensee, plaintiff Imex own and have acquired common law and federal trademark rights in the Imex Trade Dress, the Registered Word Marks, the Registered Design Marks, and the Unregistered Trade Dress and Trademarks.

//
//

COMPLAINT

142.  Plaintiffs did not authorize defendants to create, advertise, market, distribute, or sell the Accused Products or to copy the Imex Trade Dress in any way.

143.  The Accused Products copy the total image, overall appearance, and look and feel of the Imex Trade Dress.  The Imex Trade Dress is distinctive and nonfunctional.  The trade dress of the Accused Products is confusingly similar to the Imex Trade Dress, creating a likelihood of confusion between the Accused Products and the Imex Products.

144.  Defendants used and are using, without plaintiffs' authorization or consent, the Imex Trade Dress, the Registered Word Marks, the Registered Design Marks, and the Unregistered Trade Dress and Trademarks, and colorable imitations thereof, in connection with the Accused Products, in a manner likely to confuse consumers and the general public as to the source, sponsorship, affiliation, or approval of the Accused Products.

145.  Defendants infringed plaintiffs' trademarks and trade dress and are unfairly competing with Imex with knowledge of plaintiffs' exclusive rights in such trademarks and trade dress, and despite actual notice of infringement.  Defendants' conduct is willful, deliberate, intentional, and in bad faith.

146.  As a direct and proximate result of defendants' trademark and trade dress infringement, plaintiffs suffered damage in an amount to be proved at trial, but not less than Five Million Dollars ($5,000,000).  Plaintiffs are entitled to an accounting and disgorgement of profits in connection with the Accused Products.

147.  As a direct and proximate result of defendants' trademark and trade dress infringement and unfair competition, defendants have caused, and will continue to cause, irreparable harm to plaintiffs and the goodwill associated with the Imex Trade Dress, the Registered Word Marks, the

Registered Design Marks, and the Unregistered Trade Dress and Trademarks, for which plaintiffs have no adequate remedy at law.  Plaintiffs are entitled to injunctive relief against continuing infringements and destruction of infringing items.

148.   Defendants' conduct was malicious, fraudulent, oppressive, and despicable within the meaning of California law.  Plaintiffs are therefore entitled to an award of exemplary and punitive damages against defendants in a sum appropriate to punish and to make an example of them.

149.   Under the circumstances described herein, defendants will be unjustly enriched if they are allowed to profit by their wrongful conduct.  Therefore, plaintiffs are entitled to a constructive trust on, and disgorgement of, all funds, assets, accounts, and business opportunities unjustly acquired by defendants.

### *FOURTH CLAIM FOR RELIEF*
### *COPYRIGHT INFRINGEMENT*
### *UNDER 15 U.S.C. § 101 et seq.*

150.   Plaintiffs hereby incorporate by reference paragraphs 1 through 149 above, as if fully set forth herein.

151.   Plaintiff Grant is the owner of the Registered Copyrighted Works set forth in Paragraphs 31 through 34, inclusive, and exclusively licenses such Registered Copyrighted Works to plaintiff Imex.

152.   The Registered Copyrighted Works are wholly original and at all times constituted and constitute copyrightable subject matter under the laws of United States.

153.   Plaintiffs secured and are entitled to exclusive rights and privileges in and to the copyright of the Registered Copyrighted Works under 17 U.S.C. § 106.

COMPLAINT

154. Defendants gained access to the Registered Copyrighted Works by purchasing Imex Products from Imex and obtaining information about the Imex Products from plaintiffs.

155. Defendants are and were reproducing, copying, duplicating, publicly displaying, distributing, preparing derivative works based upon, and otherwise exploiting the Registered Copyrighted Works, in physical and digital form, and manufacturing, selling, offering to sell, marketing, advertising, promoting, shipping, distributing, and otherwise exploiting exact copies of the Registered Copyrighted Works, or substantially similar copies of the Registered Copyrighted Works, or derivative works based upon the Registered Copyrighted Works, among other infringements, knowingly and wilfully, without plaintiffs' authorization or consent, and despite actual notice of infringement.

156. Defendants KGR, Kommi, Adil Al Hourani, Omar Al Hourani, and other defendants knew or had reason to know of the infringing activity of defendant Zest US and intentionally induced, materially contributed to, and encouraged Zest US's infringing activity. Defendants Kommi, Zest US, Adil Al Hourani, Omar Al Hourani, and other defendants knew or had reason to know of the infringing activity of defendant KGR and intentionally induced, materially contributed to, and encouraged KGR's infringing activity. Defendants KGR, Kommi, Zest US, Adil Al Hourani, Omar Al Hourani, and other defendants knew or had reason to know of the infringing activity of defendant Shims Bargain, Inc. and intentionally induced, materially contributed to, and encouraged Shims Bargain, Inc.'s infringing activity.

157. Defendants had the right to stop or limit infringement by others of the Registered Copyrighted Works, including without limitation by ceasing to sell and ship Accused Products to other infringers. Defendants Adil Al Hourani, Omar Al Hourani, and other defendants are the guiding spirits

COMPLAINT

and central figures behind Zest US's infringing conduct and had the right to supervise and control Zest US's actions.  Defendant Kommi and other defendants are the guiding spirits and central figures behind KGR's infringing conduct and had the right to supervise and control KGR's actions. Defendants KGR, Kommi, Adil Al Hourani, Omar Al Hourani, and other defendants profited and directly benefited financially from Zest US's infringing activity and declined to exercise their right and ability to supervise, control, stop, and limit the infringing activity of Zest US.  Defendant Kommi, Zest US, Adil Al Hourani, Omar Al Hourani, and other defendants profited and directly benefited financially from KGR's infringing activity and declined to exercise their right and ability to supervise, control, stop, and limit the infringing activity of KGR.  Defendants KGR, Kommi, Zest US, Adil Al Hourani, Omar Al Hourani, and other defendants profited and directly benefited financially from the infringing activity of Shims Bargain, Inc. and declined to exercise their right and ability to supervise, control, stop, and limit the infringing activity of Shims Bargain, Inc.

158.  The infringement of plaintiff's rights in and to each of the Registered Copyrighted Works constitutes a separate and distinct act of infringement.

159.  The foregoing acts of infringement are and were willful, intentional, purposeful, and deliberate, in disregard of and indifferent to the rights of plaintiffs.

160.  Defendants' acts constitute infringement of plaintiffs' registered copyrights and exclusive rights under copyright in violation of 17 U.S.C. §§ 106 and 501.

161.  As a direct and proximate result of defendants' copyright infringement, plaintiffs suffered damage in an amount to be proved at trial, but not less than Five Million Dollars ($5,000,000).  Plaintiffs are entitled to an

1 accounting and disgorgement of profits in connection with the Accused
2 Products.

3 162. Alternatively, plaintiffs are entitled to recover an award of
4 statutory damages, pursuant to 17 U.S.C. § 504(c), in the maximum amount
5 of $150,000 with respect to each Registered Copyrighted Work infringed, or in
6 such other amounts as may be proper under 17 U.S.C. § 504(c).

7 163. As a direct and proximate result of defendants' copyright
8 infringement, defendants have caused, and will continue to cause, irreparable
9 harm to plaintiffs, for which plaintiffs have no adequate remedy at law.
10 Plaintiffs are entitled to injunctive relief against continuing infringements under
11 17 U.S.C. § 502 and destruction of infringing items under 17 U.S.C. § 503.

12 164. Under the circumstances described herein, defendants will
13 be unjustly enriched if they are allowed to profit by their wrongful conduct.
14 Therefore, plaintiffs are entitled to a constructive trust on, and disgorgement
15 of, all funds, assets, accounts, and business opportunities unjustly acquired
16 by defendants.

17

18 ***FIFTH CLAIM FOR RELIEF***
19 ***UNFAIR COMPETITION UNDER CALIFORNIA***
20 ***BUSINESS & PROFESSIONS CODE § 17200 et seq.***

21 165. Plaintiffs hereby incorporate by reference paragraphs 1
22 through 164 above, as if fully set forth herein.

23 166. Defendants' acts of unfair competition and unlawful
24 violations of trademark law, as alleged herein, constitute unlawful business
25 practices in violation of California Business & Professions Code §§ 17200 *et*
26 *seq.* (the "Unfair Competition Law").

27 167. Plaintiffs suffered injury and lost money or property as a
28 result of defendants' unfair competition and unlawful violations of trademark

61

COMPLAINT

law.  As a result, plaintiffs are entitled to injunctive relief pursuant to California Business & Professions Code § 17203, and an award restoring to plaintiffs any and all monies acquired by defendants by means of such unlawful, unfair, or fraudulent business acts or practices.

168.   Under the circumstances described herein, defendants will be unjustly enriched if they are allowed to profit by their wrongful conduct. Therefore, plaintiffs are entitled to a constructive trust on, and disgorgement of, all funds, assets, accounts, and business opportunities unjustly acquired by defendants.

### *SIXTH CLAIM FOR RELIEF*
### *COMMON LAW UNFAIR COMPETITION*

169.   Plaintiffs hereby incorporate by reference paragraphs 1 through 168 above, as if fully set forth herein.

170.   Plaintiff Grant and, as exclusive licensee, plaintiff Imex own the Imex Trade Dress, the Registered Word Marks, the Registered Design Marks, and the Unregistered Trade Dress and Trademarks.

171.   Defendants copied the total image, overall appearance, and look and feel of the Imex Trade Dress in the Accused Products, created, designed, manufactured, imported, shipped, marketed, advertised, distributed, sold, and offered for sale the Accused Products, mixed Accused Products and Imex Products together on store shelves and in Imex's custom display boxes and racks, used Imex's custom display boxes and racks to sell Accused Products, and charged retailers a lower price for Accused Products as compared to the Imex Products, for the purpose of deceiving retailers and customers into believing that the Accused Products and the Imex Products were from the same source, and to trade on the success, customer recognition, product quality, and goodwill of the Imex Products to fool

customers into buying the Accused Products instead.  Defendants' purpose was to compete unfairly with Imex.  Defendants' conduct is willful, deliberate, intentional, and in bad faith.

172.  As a direct and proximate result of defendants' unfair competition, plaintiffs suffered damage in an amount to be proved at trial, but not less than Five Million Dollars ($5,000,000).  Plaintiffs are entitled to an accounting and disgorgement of profits in connection with the Accused Products.

173.  As a direct and proximate result of defendants' unfair competition, defendants have caused, and will continue to cause, irreparable harm to plaintiffs, for which plaintiffs have no adequate remedy at law.  Plaintiffs are entitled to injunctive relief against continuing infringements and destruction of infringing items.

174.  Defendants' conduct was malicious, fraudulent, oppressive, and despicable within the meaning of California law.  Plaintiffs are therefore entitled to an award of exemplary and punitive damages against defendants in a sum appropriate to punish and to make an example of them.

175.  Under the circumstances described herein, defendants will be unjustly enriched if they are allowed to profit by their wrongful conduct.  Therefore, plaintiffs are entitled to a constructive trust on, and disgorgement of, all funds, assets, accounts, and business opportunities unjustly acquired by defendants.

WHEREFORE, plaintiffs pray for judgment in their favor and against defendants as follows:

1.  On all claims for relief, for damages in an amount to be proved at trial, but not less than Five Million Dollars ($5,000,000).

//

63

1    2. On all claims for relief, for an accounting of all profits

2 realized by defendants, and all others acting in concert or participating with

3 them, in connection with the Accused Products, and disgorgement of all

4 monetary gains, profits, and advantages derived therefrom.

5    3. On all claims for relief, for injunctive relief, preliminarily and

6 permanently enjoining defendants and their assignees, transferees,

7 employees, agents, and representatives, and all others acting in concert or

8 participating with them, from engaging in the unlawful acts alleged herein,

9 including the following:

10    (a) Manufacturing, selling, offering to sell, marketing,

11 advertising, promoting, importing, shipping, distributing, and otherwise

12 exploiting the Accused Products.

13    (b) Using, reproducing, copying, duplicating, displaying,

14 distributing, advertising, and otherwise exploiting the Imex Trade Dress or any

15 of the Registered Word Marks, the Registered Design Marks, or the

16 Unregistered Trade Dress and Trademarks.

17    (c) Using, displaying, marketing, advertising, promoting,

18 importing, shipping, distributing, registering, transferring, assigning, and

19 otherwise exploiting any mark or trade dress that is confusingly similar to the

20 Imex Trade Dress or any of the Registered Word Marks, the Registered

21 Design Marks, or the Unregistered Trade Dress and Trademarks.

22    (d) Reproducing, copying, duplicating, publicly displaying,

23 distributing, preparing derivative works based upon, and otherwise exploiting

24 the Registered Copyrighted Works.

25    (e) Manufacturing, selling, offering to sell, marketing,

26 advertising, promoting, importing, shipping, distributing, and otherwise

27 exploiting exact copies of the Registered Copyrighted Works, or substantially

28 //

COMPLAINT

similar copies of the Registered Copyrighted Works, or derivative works based upon the Registered Copyrighted Works.

4.     On all claims for relief, for destruction of infringing items.

5.     On the First and Second Claims for Relief, for an order requiring defendants, pursuant to 15 U.S.C. § 1116(a), to file with this Court and to serve upon plaintiffs within thirty (30) days after entry of an injunction, a report in writing and under oath, setting forth in detail the manner in which defendants complied with such judgment.

6.     On the Third and Sixth Causes of Action, for an award of exemplary and punitive damages against defendants in an amount not less than Ten Million Dollars ($10,000,000).

7.     On the Fourth Claim for Relief, for an award of statutory damages, pursuant to 17 U.S.C. § 504(c), in the maximum amount of $150,000 with respect to each Registered Copyrighted Work infringed, or in such other amounts as may be proper under 17 U.S.C. § 504(c).

8.     On the Fifth Claim for Relief, for restitutionary relief in an amount to be proved at trial.

9.     On all claims for relief, for constructive trust and disgorgement of all unjust enrichment.

10.    For costs of suit, attorney's fees in an amount not less than $150,000, and prejudgment interest.

11.    For such other and further relief as the Court may deem just and proper.


DATED:  August 2, 2022                LAW OFFICES OF JOHN A. CASE, JR.

                                      By:_____/s/_____
                                            John A. Case, Jr.
                                      Attorneys for Plaintiffs
                                      IMEX LEADER, INC and IRINA GRANT

65

COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiffs IMEX LEADER, INC, a California corporation, and IRINA GRANT hereby demand a trial by jury.


DATED:  August 2, 2022                    LAW OFFICES OF JOHN A. CASE, JR.

By:_____/s/_____
                                   John A. Case, Jr.
                                   Attorneys for Plaintiffs
                                   IMEX LEADER, INC and IRINA GRANT

66

COMPLAINT